UNITED STATES of America

v.

CRIDEN, Howard L., Jannotti, Harry P., Johanson, Louis C., Schwartz, George X., Jan Schaffer, a witness in the above-referenced proceeding, Appellant.

No. 80–2001.

United States Court of Appeals,
Third Circuit.

Argued Aug. 6, 1980.

Decided Oct. 10, 1980.

Certiorari Denied Jan. 19, 1981.
See 101 S.Ct. 924.

Harold Kohn (argued), Samuel E. Klein, Kohn, Savett, Marion & Graf, P. C., Philadelphia, Pa., for appellant, Jan Schaffer.

John C. Keeney, Deputy Asst. Atty. Gen., Paul E. Coffey, William C. Bryson, Attys., Crim. Div., Dept. of Justice, Washington, D. C., for the United States.

Richard Ben Veniste, Neil Levy, Melrod, Redman & Garlan, Washington, D. C., Paul R. Rosen (argued), Edward M. Dunham, Jr., Spector, Cohen, Hunt & Rosen, P. C., Philadelphia, Pa., for appellee, Howard L. Criden.

Richard A. Sprague, Pamela W. Higgins (argued), Philadelphia, Pa., for appellee, Schwartz.

J. Clayton Undercofler, III, Philadelphia, Pa., for appellee, Jannotti.

John Rogers Carroll, John J. Duffy, Philadelphia, Pa., for appellee, Johanson.

Seymour I. Toll, Michele Langer, Philadelphia, Pa., for amicus curiae, Bulletin Co.; Toll, Ebby & Gough, Philadelphia, Pa., of counsel.

Debevoise, Plimpton, Lyons & Gates, New York City, for amicus curiae, The New York Times Co.; Robert B. Von Mehren, James C. Goodale, John G. Koeltl, Edwin P. Rutan, II, Gary W. Kubek, New York City, of counsel.

Bernard G. Segal, James D. Crawford, Joseph C. Crawford, Philadelphia, Pa., for amicus curiae, National Broadcasting Company, Inc.; Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., of counsel.

Jack C. Landau, Sharon P. Mahoney, Clemens P. Work, Washington, D. C., for amicus curiae, Reporters Committee for Freedom of the Press.

Before ALDISERT and HUNTER, Circuit Judges, and RAMBO, District Judge.*

OPINION OF THE COURT

ALDISERT, Circuit Judge.

In *United States v. Cuthbertson*, 630 F.2d 139, (3d Cir. 1980), we held that CBS had a qualified privilege, partially overridden in that case, not to disclose unpublished information in its possession in criminal cases. Earlier, in *Riley v. City of Chester*, 612 F.2d 708 (3d Cir. 1979), a civil case, we emphasized that special circumstances exist in a criminal case that must be considered in evaluating a witness' claim of journalists' privilege. Specifically, the trial court must consider whether the reporter is alleged to possess evidence relevant to the criminal proceeding and the effect of disclosure on two important constitutionally based concerns: the journalist's privilege not to disclose confidential sources and the constitutional right of a criminal defendant to every reasonable opportunity to develop and uncover exculpatory information. 612 F.2d at 716.

This appeal requires us to decide if a journalist, summoned as a defense witness in a criminal proceeding, may refuse to affirm or deny that she had a conversation with a particular individual who has already publicly testified that the conversation occurred and that certain matters arguably relevant to the judicial inquiry were discussed. Unlike *Cuthbertson*, this case implicates published information from a self–avowed source; unlike *Riley*, it is a criminal proceeding. We emphasize at the outset that the ultimate judicial inquiry with which this appeal is concerned seeks not the source of the reporter's information, but the motivation and the credibility of a single self–avowed source.

I.

The case comes to us on an appeal by Jan Schaffer, a reporter for the Philadelphia Inquirer, from an order of the district court holding her in civil contempt for refusing to answer a question during a hearing on defendants' motions to dismiss their indictments. On May 22, 1980, defendants Howard L. Criden, an attorney practicing in Philadelphia, and Philadelphia City Councilmen Harry P. Jannotti, Louis C. Johanson, and George X. Schwartz were indicted by a federal grand jury in the Eastern District of Pennsylvania and charged with violations of federal laws exposed during a government undercover operation known as ABSCAM.[1] The indictment charges defendants with violating the Anti-Racketeering Act, 18 U.S.C. § 1962, and the Hobbs Act, 18 U.S.C. § 1951, by receiving bribes from government undercover agents posing as Arab sheiks.

Among the grounds presented for dismissing the indictment are allegations of prosecutorial misconduct and massive prejudicial pre–indictment and pretrial publicity. The charge of prosecutorial misconduct consists of an allegation that representatives of the Department of Justice and the United States Attorney's Office of the Eastern District of Pennsylvania released sensational and prejudicial information to the news media with intent to create an atmosphere inimical to the rights of the defendants. The parties concede that the ABSCAM investigation has received widespread publicity and the government has stipulated that the source of the disclosures to the press was one or more persons employed by the Department of Justice, the Federal Bureau of Investigation, and the United States Attorney's Office.

FBI officials have described ABSCAM as an operation of major proportions, apparently beginning in 1978 or earlier but not focusing on public officials until the fall of

---

* Honorable Sylvia H. Rambo, of the United States District Court for the Middle District of Pennsylvania, sitting by designation.

1. "ABSCAM" is a code name for an operation by the Federal Bureau of Investigation called Abdul Enterprises, Inc., in which Federal undercover agents posing as representatives of Middle Eastern businessmen sought help from public officials for various enterprises.

1979. Thomas P. Puccio, chief of the Justice Department's Organized Crime Strike Force in Brooklyn, New York, was the chief prosecutor and head of the operation from its inception. Around December 12, 1979, Mr. Puccio transmitted a detailed memorandum to Phillip Heyman, Assistant Attorney General in charge of the Criminal Division of the Department of Justice, summarizing developments and analyzing applicable federal statutes. This memorandum was disseminated to top officials of the Department of Justice in Washington as well as to Robert Del Tufo, United States Attorney for the District of New Jersey, and to William Webster, Director of the FBI. The memorandum does not mention defendants.

Early in 1980, the U. S. Attorney's Office for the Eastern District of Pennsylvania became actively involved in the operation. On January 29, 1980, Peter F. Vaira, U. S. Attorney for the Eastern District of Pennsylvania, met with Brian Ross of the National Broadcasting Company. Vaira testified during the dismissal hearing that Ross was aware of certain details of the operation but that, as of the date of the meeting, he was unaware that the defendants had been implicated.

On Saturday, February 2, government agents invited Criden to New York and revealed the true nature of the ABSCAM operation to him. As part of a plan to continue the operation, Vaira and others tried to convince Criden to cooperate with them in continuing undercover operations. On that date, Ross released the ABSCAM story during an evening news broadcast on Channel 4 in New York. The news story contained films of government agents visiting the homes of certain public officials. Shortly thereafter, the New York Times, in a story written by Leslie Maitland, carried a detailed account of the operation. Neither the NBC broadcast nor the Times story contained information concerning the defendants here. Puccio and Vaira testified that the New York Times story contained much of the information found in the earlier memorandum from Puccio to Heyman and that Maitland probably had gained access to the memorandum. Government officials acknowledged in testimony before the district court that leaks to the press came from within the government. Both Puccio and Vaira denied that they were the original source of the leaks.

## II.

The testimony relevant to this appeal is Vaira's statement at the indictment dismissal hearing that he learned on February 2, 1980, that the ABSCAM operation was about to be exposed in the national media. As a favor to Schaffer, and while still negotiating with Criden, he telephoned Schaffer from Strike Force headquarters in New York, told her that the story was breaking in the national news, and advised her to "catch up" on the story. App. at 714A, 715A; 717A. Vaira was asked on direct examination if he was the source of information that appeared in Schaffer's article published by the Inquirer on Monday, February 4. He denied that he was. App. at 716A. Vaira then said that he had at least one other telephone conversation with Schaffer:

> I recall that she returned a phone call and said, "I understand that there are Philadelphia city councilmen involved" and she had . . . two correct names and one incorrect. I don't recall who it was.
>
> At that point it looked to me she had some bad information.
>
> .    .    .    .    .
>
> I just said, "You are incorrect." At that time I realized she had picked up the story from Philadelphia which I thought was not a part of this bigger story, not a part of the New York Times work. . . .
>
> [S]he called me about two times or three times up in New York[.] [T]he third time she called me she had . . . the correct names.
>
> Q  Did you then say she was correct?
> A  Yes . . . . I said, "That is all I'm going to say." In the meantime she had got some incorrect and. it looked like she was going to include some incorrect names.

App. at 718A. During questioning by counsel for Criden, Vaira revealed that he first telephoned Schaffer "late in the afternoon, February 2, at sometime after an NBC–TV newscast aired at 6 or 6:30 p. m." He said that during his third conversation with Schaffer, sometime between 7:30 and 8:30 p. m. Saturday evening, he realized that she "had the full story" but that he did not confirm it. App. at 739A.

Schaffer was subpoenaed as a defense witness. Prior to her testimony, the court emphasized that it would not require her to reveal the sources of her information. App. at 983A. Schaffer's attorney objected to the court's order requiring Schaffer to testify, arguing that the government's concession that its employees were responsible for the releases obviated Schaffer's testimony. The court rejected this argument, however, reasoning that the need to preserve confidentiality of sources evaporates when the source himself has admitted his disclosure. In addition, the court stated that issues of Vaira's motivation and credibility remained unresolved. App. at 983A–84A.

When Schaffer's attorney continued to press the motion to quash the subpoena, the court denied the motion in a ruling that is critical to this appeal. It indicated that questions regarding the balance between the journalist's privilege and the defendant's right to a fair trial must "be made on the question by question basis." Following a sidebar conference counsel for defendant Schwartz continued the direct examination. Schaffer disclosed her occupation and her acquaintance with Vaira before the colloquy at issue occurred:

Q   On February 2, 1980, did you have a conversation with Mr. Vaira concerning ABSCAM?

MR. KOHN: That's objected to your Honor.

THE COURT: Objection overruled.

MR. SPRAGUE: Would you answer that question.

MISS SCHAFFER: May I confer with counsel?

. . . . .

Your Honor, I am going to respectfully decline—

THE COURT: You are directed to answer the question either yes or no.

. . . . .

[T]he court has ordered you now to answer the question either yes or no. You're not being asked anything more [than] whether you had a conversation with him. Now, do you answer the question or do you refuse to answer the question?

THE WITNESS: I continue to decline to answer the question.

THE COURT: All right, you're held in contempt and it's civil contempt. You may purge yourself of contempt by answering the question and the contempt is that you be remanded to the custody of the marshal until you answer the question. If you haven't answered it within six months, you'll be turned loose.

App. at 988A–90A. The trial court remanded Schaffer into the custody of her attorney pending disposition of this appeal.

In her brief, Schaffer has described her refusal to answer the one question as a "constitutional crisis." Brief for Appellant at 16. Relying on *Riley*, she argues that she has a privilege to refuse to answer the question. She predicates her defense on an assertion that an answer would have revealed, directly or indirectly, a source of news; that the defendants have failed to show that the information sought is crucial to their defense; that they have failed to show that the information sought is unavailable from other sources; and that the compelled disclosure of sources was premature.

### III.

Appellant's first argument is that the contempt proceeding is moot. She relies on a July 31, 1980, statement by the district court denying the defendants' motion to enforce subpoenas directed to other representatives of the news media:

There is, of necessity, a limit to pretrial explorations of this kind. I believe that limit has now been reached in this case,

and that no useful purpose would be served in further pretrial pursuit of the matter. The existing record provides an adequate basis for the arguments the defendants may wish to make at this stage. App. at 1434a. Appellant notes that she has been held in civil contempt until she answers the question asked her by defense counsel. The court has called a halt to pretrial activity, and the pretrial record is now closed. Because the record is now closed, she argues, her testimony is no longer needed. Therefore, she concludes, the reason for the civil contempt has dissipated, and the order of contempt is now moot.

On its face, this argument contains much internal logic. Nevertheless, a necessary factual predicate of the argument can be challenged. We are not persuaded that the district court has closed the record with respect to Schaffer's testimony. When this same argument was presented to the district court on August 4, 1980–two days prior to oral argument in this appeal–in the form of a motion to vacate the contempt order, the court responded by denying the motion and stating in the memorandum that accompanied the order:

> [I]n my view, what is at stake here is the need to vindicate the Court's authority to determine the manner in which its hearings shall be conducted, and the manner in which issues shall be presented to the Court for resolution. By her steadfast refusal to answer even the most innocuous question despite the Court's direct order, the witness simply precluded the Court from pursuing the orderly, question–by–question analysis essential to the appropriate presentation and resolution of the issues involved. Recognition of the newsgatherers' privilege surely does not carry with it the notion that reporters are immune from giving non–privileged evidence, or that, unlike all other witnesses, reporters need answer only those questions which they deem to be relevant and material.

App. at 1447a. The court therefore denied the motion to vacate the contempt order. Subsequently, in its memorandum opinion

dated August 18, 1980, denying without prejudice defendants' motions to dismiss because of prosecutorial misconduct, the district court emphasized that further factual development during trial would be necessary before it could decide this issue. *United States v. Criden,* Cr. No. 80–166, typescript mem. op. at 12 (E.D.Pa. Aug. 18, 1980).

We detect two discrete reasons why the issue is not moot. First, although the court's language strongly indicates that it will receive no further testimony on defendants' motion to dismiss the indictment, we are not convinced that it has closed the record on Schaffer's testimony. The very nature of the penalty imposed–incarceration for a maximum of six months, unless or until an answer is forthcoming–requires that the record be open for Schaffer's testimony. If the penalty imposed is bottomed on the notion that "[she] carr[ies] the keys of [her] prison in [her] own pocket[ ]," *In re Nevitt,* 117 F. 448, 461 (8th Cir. 1902), the record necessarily cannot be closed if she decides to use that key. In addition, Schaffer's testimony has not become irrelevant to defendants' attempt to have the indictment dismissed because their motions, though recently denied, may be resubmitted at the close of the trial.

Second, the district court has indicated without ambiguity that it does not view these contempt proceedings as moot. In addition to implying that the record is open to receive her testimony, it has explicitly referred to the public interest in vindicating the court's authority to hold orderly hearings. Appellant counters this justification by arguing that vindication of the court's authority is not a purpose of civil contempt. Oral Argument Transcript at 8–9. Judicial authority, she argues, is vindicated through imposition of sanctions for criminal contempt, whereas civil contempt is reserved solely to compel action or testimony for the benefit of a litigant.

We reject appellant's argument that civil contempt does not support the court's authority. Our starting point is the teaching of *Bessette v. W. B. Conkey Co.,* 194 U.S. 324, 328–29, 24 S.Ct. 665, 667, 48 L.Ed. 997

(1904) (quoting *In re Nevitt*, 117 F. 448, 458 (8th Cir. 1902).

> A criminal contempt involves no element of personal injury. It is directed against the power and dignity of the court, and private parties have little if any interest in the proceedings for its punishment. But if the contempt consists in the refusal of a party or a person to do an act which the court has ordered him to do for the benefit or the advantage of a party to a suit or action pending before it, and he is committed until he complies with the order, the commitment is in the nature of an execution to enforce the judgment of the court, and the party in whose favor that judgment was rendered is the real party in interest in the proceedings. [Citation omitted].

> .... [I]f in the progress of a suit a party is ordered by the court to abstain from some action which is injurious to the rights of the adverse party, and he disobeys that order, he may also be guilty of contempt, but the personal injury to the party in whose favor the court has made the order gives a remedial character to the contempt proceeding. The punishment is to secure to the adverse party the right which the court has awarded to him....

> It may not be always easy to classify a particular act as belonging to either one of these two classes. It may partake of the characteristics of both. A significant and generally determinative feature is that the act is by one party to a suit in disobedience of a special order made in behalf of the other. Yet sometimes the disobedience may be of such a character and in such a manner as to indicate a contempt of the court rather than a disregard of the rights of the adverse party.

The Supreme Court has repeatedly recognized the institutional purposes served by civil contempt orders. In *Gompers v. Bucks Stove & Range Co.*, 221 U.S. 418, 443, 31 S.Ct. 492, 498, 55 L.Ed. 797 (1911), the Court stated: "[I]f the case is civil and the punishment is purely remedial, there is also a vindication of the court's authority." But vindication of the court's authority need not be a collateral benefit of a civil contempt order. Sanctions for civil contempt may be used either to compensate the complainant for losses sustained, or to coerce the defendant into compliance with the court's order, thereby vindicating the court's institutional authority. *See United States v. United Mine Workers*, 330 U.S. 258, 303–04, 67 S.Ct. 677, 701, 91 L.Ed. 884 (1947). *Hutto v. Finney*, 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978), serves as the most recent instruction by the Supreme Court: "In this case, the award of attorney's fees for bad faith served the same purpose as a remedial fine imposed for civil contempt. *It vindicated the District Court's authority over a recalcitrant litigant.*" *Id.* at 691, 98 S.Ct. at 2574 (emphasis added).[2]

The appellant relies primarily on this court's decision in *In re Grand Jury Investigation (Braun)*, 600 F.2d 420 (3d Cir. 1979), to support her position that civil contempt is solely coercive. In that decision, however, we relied on *Gompers* for the proposition that although "civil contempt is *primarily* coercive in nature," no bright line separates civil and criminal contempt. *Id.* at 423 & n.6 (emphasis added). We do not perceive the role of the district court in this important case as a hired umpire dragged in from the street to preside over a dispute between private litigants. Nor is the court a private law faculty, the recipient of an *Aktenversendung*, a request for a decision based on found facts.[3]

---

**2.** Moreover, in describing disobedience of a court–sanctioned subpoena, the Supreme Court has said that whether the resulting contempt is labelled civil, quasi–criminal, or criminal, "its purpose is by no means spent upon purely private concerns. It stands in aid of the authority of the judicial system, so that its orders

and judgments are not rendered nugatory...." *Juidice v. Vail*, 430 U.S. 327, 336 n.12, 97 S.Ct. 1211, 1217 n.12, 51 L.Ed.2d 376 (1977).

**3.** *See* Aldisert, *The Nature of the Judicial Process: Revisited*, 49 Univ. of Cincinnati L.Rev. 1, 45 (1980).

Important constitutional precepts collide in this case, and the court must be ever vigilant, virtually on a question–by–question basis, to ensure that its awesome authority is constantly active to protect the rights of both newsgatherers and criminal defendants. Such a case, probably more than any other type of litigation except capital cases and cases raising national security concerns, energizes the court as a vitally important establishment of government. Courts were designed by our society to safeguard the rights of litigants, but may do so only by safeguarding their own institutional integrity. Especially in this type of case, in which complex proceedings affecting several highly prized rights must be conducted in an extremely formal and orderly fashion, the court must retain authority to impose sanctions when its rules are deliberately flouted. Otherwise, the court's effectiveness would be blunted and public respect and esteem for the judicial institution seriously dissipated. We conclude that in this case, the authority of the court is as vital as the interests of the private litigants. We therefore agree with the second circuit that "the court's effort[ ] at vindicating its authority [is] an interest which may be implicated in either civil or criminal proceedings." *United States v. Wendy*, 575 F.2d 1025, 1029 n.13 (2nd Cir. 1978); *see also United States v. Work Wear Corp.*, 602 F.2d 110, 115 (6th Cir. 1979). Even had we determined that the indictment dismissal record is closed, the important legal question presented by this appeal would not be moot because of the institutional importance of this order. Accordingly, for two separate reasons, that the record is still open to receive appellant's testimony, and that her refusal to testify and the resulting sanction implicate the court's authority, we conclude that the matter is not moot and proceed to examine the merits.

### IV.

If a case may be decided on either non–constitutional or constitutional grounds, a federal court will inquire first into the non–constitutional question. This practice reflects the deeply rooted doctrine "that we ought not to pass on questions of constitutionality ... unless such adjudication is unavoidable." *Harris v. McRae*, —— U.S. ——, ——, 100 S.Ct. 2671, 2683, 65 L.Ed.2d 784 (1980) (quoting *Spector Motor Service, Inc. v. McLaughlin*, 323 U.S. 101, 105, 65 S.Ct. 152, 154, 89 L.Ed. 101 (1944)). We must therefore address the argument advanced by the Department of Justice that the question the appellant refused to answer was wholly immaterial to the proceedings below because it could not have produced the kind of evidence of prejudice either in the grand jury or the petit jury that would justify dismissal of the indictment. Relying on *United States v. Duncan*, 598 F.2d 839, 865 (4th Cir.), *cert. denied*, 444 U.S. 871, 100 S.Ct. 148, 62 L.Ed.2d 96 (1979); *United States v. Stanford*, 589 F.2d 285, 298–99 (7th Cir. 1978), *cert. denied*, 440 U.S. 983, 99 S.Ct. 1794, 60 L.Ed.2d 244 (1979); and *Martin v. Beto*, 397 F.2d 741, 751 (5th Cir. 1968) (Thornberry, J., concurring), *cert. denied*, 394 U.S. 906, 89 S.Ct. 1008, 22 L.Ed.2d 216 (1969), the Department contends that even if the defendants are correct in their allegation that the pretrial publicity was the product of prosecutorial misconduct, dismissal of the indictment would not be a proper remedy in the absence of proof of actual prejudice. This argument misses the mark.

More is involved in this case than the factual question whether the pretrial publicity resulted from government misconduct. Trial counsel conceded before the district court that government representatives were sources of the disclosures. *See United States v. Criden*, Cr. No. 80–166, typescript op. at 2 (E.D.Pa. July 10,. 1980) (memorandum accompanying order of contempt). As the trial court recognized, both the credibility of government witnesses in their testimony during the hearing and the motivation of government employees in releasing the information are central to defendants' motions to dismiss the indictment. App. at 984A.

Testimony at the hearing indicated that the United States Attorney for the District of New Jersey forwarded a memorandum

of law concerning the ABSCAM operation to Vaira. Defendants claim the memorandum seriously questions the acceptability of the investigation, and prosecutions brought pursuant to it, under the due process clause. At this pretrial stage, they argue that no indictments would have been issued against them had the normal course of governmental investigation gone forward, but that the indictments against them were in fact forced because of the pre–indictment publicity deliberately orchestrated by government representatives. Although the court noted that the "principal thrust" of the argument was akin to entrapment, it summarized this portion of the argument in its order of August 18 denying without prejudice the motions to dismiss for prosecutorial misconduct: "The defendants assert that persons for whose conduct the prosecution is accountable intentionally caused the premature and excessive media coverage of the Abscam investigation, in order to stampede the grand jury into returning the Indictment, and in order to preclude responsible officials in the Justice Department from declining to prosecute." *United States v. Criden*, Cr. No. 80–166, typescript mem. op. at 8 (E.D.Pa. Aug. 18, 1980). In denying the motions, the court recognized that defendants would probably raise the issues again after trial. *Id.* at 12.

The argument presented by the Department of Justice in favor of reversing the contempt order is facially appealing because indictments are rarely dismissed for prosecutorial misconduct. *See In re Grand Jury Investigation (Lance)*, 610 F.2d 202, 219 & n.14 (5th Cir. 1980); *United States v. Stanford*, 589 F.2d 285, 298–99 (7th Cir. 1978), *cert. denied*, 440 U.S. 983, 99 S.Ct. 1794, 60 L.Ed.2d 244 (1979). Nevertheless, to accept the argument would require us to formulate a general legal principle on a record

inadequate even to state a specific rule.[4] Indeed, the government would have us announce as a general proposition that there is no conceivable set of facts under which this court, either by constitutional mandate, see *United States v. Twigg*, 588 F.2d 373, 378–81 (3d Cir. 1978), or by use of its supervisory power over law enforcement in this circuit, see *Marshall v. United States*, 360 U.S. 310, 313, 79 S.Ct. 1171, 1173, 3 L.Ed.2d 1250 (1959); see also *Hampton v. United States*, 425 U.S. 484, 494–95, 96 S.Ct. 1646, 1652, 48 L.Ed.2d 113 (1976) (Powell, J., concurring in the judgment); *Hoffa v. United States*, 385 U.S. 293, 314, 87 S.Ct. 408, 419, 17 L.Ed.2d 374 (1966) (Warren, C. J., dissenting), would dismiss the indictment. Although presented by the Department as a means to avoid a constitutional issue, this argument actually would require us to abandon a fundamental tenet of constitutional adjudication: a court may not decide a constitutional issue in the abstract. See *United States v. Fruehauf*, 365 U.S. 146, 157, 81 S.Ct. 547, 553, 5 L.Ed.2d 476 (1961); *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 241, 57 S.Ct. 461, 464, 81 L.Ed. 617 (1937) (case must present "a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts."); *cf. Golden v. Zwickler*, 394 U.S. 103, 108–09, 89 S.Ct. 956, 959–60, 22 L.Ed.2d 113 (1969) (no live controversy in action for declaratory judgment).

■ At this stage of the proceedings we must decide a much narrower question: Should defendants be allowed to develop a full record to support their allegations of outrageous prosecutorial misconduct? The trial court has already implicitly deter-

---

**4.** Dean Pound defined "rules" of law as "precepts attaching a definite detailed legal consequence to a definite, detailed state of facts. . . . [T]hey are definite threats of definite, detailed official action in case of a definite, detailed state of facts." Pound, *Heirarchy of Sources and Forms in Different Systems of Law*, 7 Tulane L.Rev. 475, 482 (1933). In contrast, he defined "principles" as "authoritative starting

points for legal reason, employed continually and legitimately where cases are not covered or are not fully or obviously covered by rules in the narrower sense." *Id.* at 483. In the common law tradition, a single case rarely sets forth a principle; a principle emerges from a line of decisions as a broad statement of reasons for those decisions. Aldisert, *supra* note 3, at 28.

mined, as evidenced by its decision to conduct a hearing, that this motion is not patently frivolous. We think the better course is to allow development of a record to the extent necessary in the trial court's discretion to permit a concrete evaluation of defendants' motions. Accordingly, we must address the question whether Schaffer may properly assert a privilege to avoid answering the question for which she was held in contempt.

## V.

We must emphasize at the outset that this case does not implicate only the first amendment. Rather, it highlights a tension between the first amendment and the fifth and sixth amendments. The first amendment states: "Congress shall make no law . . . abridging the freedom of speech, or of the press." The sixth amendment requires that in all criminal prosecutions, the accused shall have compulsory process for obtaining witnesses, and the fifth amendment guarantees that he shall not be deprived of life, liberty, or property without due process of law. The tension has been described as a balance between the "freedom of the press and the obligation of all citizens to give relevant testimony with respect to criminal conduct." *Branzburg v. Hayes*, 408 U.S. 665, 710, 92 S.Ct. 2646, 2671, 33 L.Ed.2d 626 (1972) (Powell, J., concurring). The parties to this proceeding cannot rely on the precise text of the Constitution but must look to the gloss added to it by previous decisions of courts faced with specific cases and controversies. All the specific rights and privileges granted to the press have been established by means of judicial interpretations of naked constitutional text, and every court formulation of a specific nuance of the Constitution's text has been accompanied by stated reasons. The reasons for the courts' pronouncements are as important as the pronouncements themselves.

## A.

We are guided by previous interpretations of the constitutional text by both the Supreme Court and this court. The first amendment "was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people," *Roth v. United States*, 354 U.S. 476, 484, 77 S.Ct. 1304, 1308, 1 L.Ed.2d 1498 (1957), and bottomed on "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide–open . . . ." *New York Times Co. v. Sullivan*, 376 U.S. 254, 270, 84 S.Ct. 710, 721, 11 L.Ed.2d 686 (1964). This national commitment to an unfettered exchange of ideas has been described most recently as a bulwark against "arbitrary interference with access to important information . . . ." *Richmond Newspapers, Inc. v. Virginia*, —— U.S. ——, ——, 100 S.Ct. 2814, 2831, 65 L.Ed.2d 973 (1980) (Stevens, J., concurring). This characterization is justified not because of the journalist's role as a private citizen employed by a private enterprise, but because reporters are viewed "as surrogates for the public." *Richmond Newspapers, Inc. v. Virginia*, —— U.S. ——, ——, 100 S.Ct. 2814, 2825, 65 L.Ed.2d 973 (1980) (per Chief Justice Burger). This court has held flatly that journalists have a federal common law privilege, albeit qualified, to refuse to disclose their confidential sources. *Riley v. City of Chester*, 612 F.2d 708, 715 (3d Cir. 1979).

But we believe that very pragmatic reasons as well as these more abstract concerns underlie our national commitment. The courts have made a value judgment that it is far better for there to be immediate, unshackled distribution of news, at the risk of some factual error, *New York Times Co. v. Sullivan*, 376 U.S. at 271–72, 84 S.Ct. at 721, than a restraint of the flow of public information that more likely than not would result if confidential news sources had to be identified. This judgment is based on a candid recognition of private human experience, completely outside the media world, in which it is commonplace for a private individual, when conveying news, information, or plain gossip to a friend, to preface the disclosure with "Please don't tell anyone that I told you, but . . . ." More often than not, unless the declarant has faith that the recipient will preserve

the confidence, he will not bestow it; also more often than not, when the recipient of the information conveys it to a third person, he respects the confidence of the original source.

Moreover, there is a general expectation in certain sectors of society that information flows more freely from anonymous sources. Experience in the operation of such public service facilities as hotels, restaurants, and common carriers shows that proprietors often solicit from their customers anonymous information grading the service received. Law enforcement officials frequently rely on anonymous tips.[5] The rule protecting a journalist's source therefore does not depart significantly from daily experience in informal dissemination of information.

The reporters' privilege also attempts to protect the source from retribution. If a practice in private industry is exposed by a person in a given employment hierarchy, he risks retribution at the hands of his superiors and his peers if he is identified as the source. Similar retribution is not unknown in government service. The danger of retaliation against a private citizen who reports criminal activities is obvious.

Our national commitment to the free exchange of information also embodies a recognition that the major sources of news are public figures, and that in addition to being newsmakers, these sources fashion public policy for government at all levels and in all branches. New ideas must be tested in the crucible of public opinion if our representatives are to receive guidance in deciding whether a suggested policy will receive public endorsement or opposition. It is extremely important therefore that varying concepts of public policy be defined and redefined, tested and retested, by wide public dissemination. In this respect, the communications media not only serve as the vehicle that widely disperses information but also constitute an important instrument of democracy that assists our officials in fashioning public policy. Without the protection of the source, the cutting edge of this valuable societal instrument would be severely dulled and public participation in decision–making severely restricted. The brute fact of human experience is that public officials are far more willing to test new ideas under the public microscope through anonymous disclosure than when they are required to be identified as the sources.

These extremely impressive pragmatic reasons, as well as conceptually abstract *a priori* principles, underlie the precept that a journalist does in fact possess a privilege that is deeply rooted in the first amendment. When no countervailing constitutional concerns are at stake, it can be said that the privilege is absolute; when constitutional precepts collide, the absolute gives way to the qualified and a balancing process comes into play to determine its limits. Thus, there are sound reasons for safeguarding the qualified privilege within the limits dictated by the purposes it serves. The rule follows where its reason leads; where the reason stops, there stops the rule. *United States v. Schreiber*, 599 F.2d 534, 537 (3d Cir. 1979).[6]

---

5. *See McCray v. Illinois*, 386 U.S. 300, 312–14, 87 S.Ct. 1056, 1062–64, 18 L.Ed.2d 62 (1967); *Rugendorf v. United States*, 376 U.S. 528, 533, 84 S.Ct. 825, 828, 11 L.Ed.2d 887 (1964). Confidentiality of informants in this context is not absolute, however. As this court noted in *United States v. Jones*, 492 F.2d 239, 243 (3d Cir. 1974),

> [w]e know that to be successful in the fight against unlawful narcotics traffic, the agents of the Bureau of Narcotics must rely extensively upon the use of informants. It is no secret either that often these informants are not pillars of the community and are most reluctant to make themselves available for testimony in court. Nonetheless, the burdens we impose upon the government officers are justified by the necessity of preserving the integrity of the trial process. The invaluable contribution made to society by the difficult and dangerous work of the narcotics agent cannot be diluted by a conviction obtained by other than a fair trial. *See also Roviaro v. United States*, 353 U.S. 53, 60–61, 77 S.Ct. 623, 627–628, 1 L.Ed.2d 639 (1957).

6. The source of this sentence is, of course, K. Llewellyn, The Bramble Bush 157–58 (1960). The Supreme Court has approved this analysis of qualified privileges in the context of government informers:

### B.

█ The journalists' privilege therefore must be considered in the context of Supreme Court teachings that there is no absolute right for a newsman to refuse to answer relevant and material questions asked during a criminal proceeding. *Branzburg v. Hayes*, 408 U.S. at 690–91, 92 S.Ct. at 2661. Although briefs filed in support of Schaffer exaggerate both the scope of the privilege and the gravity of this particular appeal,[7] this court has taken a more reasonable view of the balance between the privilege and a criminal defendant's rights. We have previously adopted the formulation in the concurring opinion of Justice Powell in *Branzburg*:

> The asserted claim to privilege should be judged on its facts by striking a proper balance between freedom of the press and the obligation of all citizens to give relevant testimony with respect to criminal conduct. The balance of these vital constitutional and societal interests on a case–by–case basis accords with the tried and traditional way of adjudicating such questions.

> The scope of the privilege is limited by its underlying purpose. Thus, where the disclosure of the contents of a communication will not tend to reveal the identity of an informer, the contents are not privileged. Likewise, once the identity of the informer has been disclosed to those who would have cause to resent the communication, the privilege is no longer applicable.
>
> A further limitation on the applicability of the privilege arises from the fundamental requirements of fairness. Where the disclosure of an informer's identity, or of the contents of his communication, is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the privilege must give way. In these situations the trial court may require disclosure and, if the Government withholds the information, dismiss the action.

*Roviaro v. United States*, 353 U.S. 53, 60–61, 77 S.Ct. 623, 627–28, 1 L.Ed.2d 639 (1957) (footnotes omitted).

7. For example, the Bulletin Company's brief states that "[i]t is difficult to put a more disturbing example of arbitrariness destroying a constitutionally protected right. Unless corrected, the error below exposes every reporter to the same kind of constitutionally indefensible treatment whenever an allegedly admitted

*Riley v. City of Chester*, 612 F.2d at 716 (quoting *Branzburg v. Hayes*, 408 U.S. at 710, 92 S.Ct. at 2671 (Powell, J., concurring)). More recently, Justice Rehnquist has stated that although the courts "have shown a special solicitude for freedom of speech and of the press, we have eschewed absolutes in favor of a more delicate calculus that carefully weighs the conflicting interests to determine which demands the greter protection under the particular circumstances presented." *Smith v. Daily Mail Publishing Co.*, 443 U.S. 97, 106, 99 S.Ct. 2667, 2672, 61 L.Ed.2d 399 (1979) (Rehnquist, J., concurring) (citations omitted). We therefore reject any implication by appellant or amici that the first amendment necessarily must override other important values whenever a conflict arises. *See Branzburg v. Hayes*, 408 U.S. at 692, 92 S.Ct. at 2662.

The appellant seeks to strike even the threshold question of whether Vaira had a conversation with her. The Supreme Court teaches us, however, that "[e]videntiary privileges in litigation are not favored, and even those rooted in the Constitution must

source testifies." Brief for Bulletin Company, Amicus Curiae, at 19. The New York Times Company states:

> Unless the decision below is reversed, reporters will be called routinely and repeatedly to testify–without preliminary findings that their testimony is crucial or unobtainable from other sources–with respect to matters that go to the very core of the newsgathering process. The deterrent effect on these reporters and on reporters covering other sensitive stories, as well as on their sources, would be inevitable.

Brief for New York Times Company, Amicus Curiae, at 3. Perhaps more incredible is the statement by the Reporters Committee for Freedom of the Press:

> The Justice Department is cooperating in this hunt for news sources by failing to aggressively oppose these subpoenas, as it has done in previous cases. It is helping the defendants to undermine its own indictment because it believes, apparently, that by sacrificing this news reporter, the government will be able to purge itself before the Congress and the public of its conceded role in leaking news of the ABSCAM investigation.

Brief for Reporters Committee for Freedom of the Press, Amicus Curiae, at i–ii.

give way in proper circumstances," *Herbert v. Lando,* 441 U.S. 153, 175, 99 S.Ct. 1635, 1648, 60 L.Ed.2d 115 (1979), and that, " '[w]hatever their origins, these exceptions to the demand for every man's evidence are not lightly created nor expansively construed, for they are in derogation of the search for truth.' " *Id.* (quoting *United States v. Nixon,* 418 U.S. 683, 710, 94 S.Ct. 3090, 3108, 41 L.Ed.2d 1039 (1974)). The Court has placed particular emphasis on the production of evidence in criminal trials. It has grounded this need for evidence on both the confrontation and compulsory process clauses of the sixth amendment and on the due process clause of the fifth amendment. To protect these constitutionally–founded rights, courts must assure that all relevant and admissible evidence is produced. *United States v. Nixon,* 418 U.S. 683, 711, 94 S.Ct. 3090, 3109, 41 L.Ed.2d 1039 (1974). Courts must tread carefully on the hallowed ground where these basic concerns, the free flow of information and the fair administration of criminal justice, conflict. *See Riley v. City of Chester,* 612 F.2d at 716; *cf. Cox Broadcasting Corp. v. Cohn,* 420 U.S. 469, 491, 95 S.Ct. 1029, 1044, 43 L.Ed.2d 328 (1974) (conflict between free press and individual privacy).

■ Notwithstanding the agonizing difficulty that attends an accommodation of conflicting interests in a clash of constitutional principles, this court has nevertheless fashioned a formula in a related context that may serve as a compass in this case: "In striking the delicate balance between the assertion of the privilege on the one hand and the interest of either criminal or civil litigants seeking the information the materiality, relevance and necessity of the information sought must be shown." *Riley v. City of Chester,* 612 F.2d at 716. Moreover, we have declared that the requisite balance cannot be reached unless the moving party shows that he has attempted to obtain the information from other sources. *Id.* at 717.

C.

We make clear that the *Riley* test is utilized to determine under what circum-

stances a journalist no longer possesses the qualified privilege to refuse to name a source. We make equally clear that this case does not require disclosure of sources. Instead, it presents the explicit question whether this reporter is required to affirm or deny that she had a conversation with Vaira, a self–avowed source. It also presents an implicit question: whether she is required to reveal the substance of Vaira's conversation with her, omitting portions that explicitly identify other sources.

■ Under the circumstances of this case it is not necessary to fashion a test other than *Riley* to decide these questions. Even under the more stringent test developed to determine when a reporter may be compelled to divulge a source, the defendants have established a record sufficient to demonstrate their entitlement to the limited information sought. We need not develop a precise test for the peculiar circumstances presented here, although we will venture the view that the defendants probably should be required to prove less to obtain the reporter's version of a conversation already voluntarily disclosed by the self–confessed source than to obtain the identity of the source itself.

Although the district court did not recite the *Riley* factors *ipsissimis verbis,* we will now proceed to determine whether its ruling can be justified under *Riley.* Appellant first argues that the court erred because it did not specifically articulate the *Riley* factors. Because the record does not disclose that appellant requested a precise consideration of *Riley,* we will not fault the district court if its decision can be justified by application of the factors. Our only inquiry, therefore, is whether the court's order comports with the standards developed in *Riley.*

■ *Riley* isolated three criteria that must be met before a reporter can be compelled to disclose a confidential source. *Riley,* 612 F.2d at 717. First, the movant must demonstrate that he has made an effort to obtain the information from other

sources. Second, he must demonstrate that the only access to the information sought is through the journalist and her sources. Finally, the movant must persuade the court that the information sought is crucial to the claim. Although this case does not require a source disclosure, we conclude that defendants have met their burden under the stringent *Riley* test for source disclosure.

Defendants have attempted to obtain information relevant to their motion elsewhere, and therefore meet the first criterion under *Riley*. They called Vaira to testify regarding his knowledge of disclosures from his office. They also sought disclosure of "The Blumenthal Report," a Department of Justice investigation into the source of the ABSCAM leaks. Oral Argument Transcript at 39–40. The district court denied their motion for release of the Blumenthal Report by order of July 31, 1980. App. at 1435a. More importantly, however, Schaffer is the most logical source of information about the conversation with Vaira because she was the other participant in it. Having called Vaira, and having noted the unresolved questions regarding his testimony, defendants' next step was to call Schaffer.

The same analysis applies to the second criterion under *Riley*. The district court stated that the purpose of Schaffer's testimony was to shed light on Vaira's motivations in disclosing certain information to her and on his credibility. Only Schaffer will be able to testify to Vaira's credibility with respect to the conversation. Her recollection of Vaira's remarks in the context of the conversation is also a valuable source of information about his motives for disclosing, and particularly for initiating the dialogue with her. Defendants quite clearly have no other source from which they can acquire this insight.

The final criterion under *Riley*, relevance and importance to the particular proceeding, follows from the preceding discussion. To compile a complete record for purposes of the motion to dismiss for prosecutorial misconduct, the motivations and credibility of Vaira must be examined. We realize that defendants may fail in their attempt to prove outrageous conduct sufficient to warrant dismissal, but even though we cannot intimate the standards for granting their motions we can at least assume that motivation and credibility would be important to a court entertaining such a motion. We conclude, therefore, that defendants have met the test under *Riley* and, because no source disclosure is currently requested, that they have justified the court's order for Schaffer to answer the question put to her.

Appellant argues that if she testifies that Vaira did not speak to her, the subsequent line of questions may lead to disclosure of sources. This argument gets appellant nowhere. First, the district court has declared that it is going to rule on a question–by–question basis and that its intention is to have no additional sources revealed. Second, even though the court imposed strict limitations on the inquiry, we must not forget that *Riley* indicates the circumstances in which the reporter may not assert her qualified privilege. Satisfaction of the *Riley* test means that countervailing constitutional rights override the reporter's privilege to protect her sources. In view of the district court's announced limitations, and our assumption that future disputes will be resolved under the framework constructed in *Riley*, we do not reach the source disclosure issue here. We hold only that the district court did not err in ordering Schaffer to answer a question unrelated to source disclosure, and that her refusal to do so was grounds for civil contempt.

#### D.

Appellant also cannot bottom her claim on the abstract statement in *United States v. Cuthbertson*, 630 F.2d 139, 147 (3d Cir. 1980): "Nor does the fact that the government has obtained waivers from its witnesses waive the privilege. The privilege belongs to CBS, not the potential witnesses, and it may be waived only by its holder." As we have noted previously, Vaira admitted that he was a source. In the view we take, this is not a case of waiving any privilege. We have assumed, as we must, that this isolated statement in the *Cuth-*

*bertson* opinion is valid and that appellant was the holder of an unwaived journalist's qualified privilege. As the *Cuthbertson* quotation indicates, Vaira's admission did not constitute a waiver of Schaffer's own qualified privilege not to reveal her unpublished recollections as to the contents of her discussions with Vaira. We also recognized in *Cuthbertson*, however, that *Riley* required the district court to "balance the defendant's need for the material against the interests underlying the privilege." 630 F.2d at 148. We have shown above, in Part V.C. of this opinion, that after applying the test set forth in *Riley* to the circumstances of this case, Schaffer's qualified privilege to refuse to disclose the contents of the Vaira conversation must yield to defendants' need for the material. We have also shown that, having made this determination, it is unnecessary for us to develop a precise test for balancing defendants' needs against Schaffer's somewhat attenuated interest in refusing to confirm or deny the occurrence of the Vaira conversation. Moreover, she is to disclose not the source of any information, but the contents of a conversation from a named declarant who has already testified under oath what he said to her.

## VI.

Accordingly, the order of the district court declaring appellant to be in civil contempt of the district court will be affirmed.

RAMBO, District Judge, concurring.

I concur in the result reached by the majority, but for different reasons. The majority attempts to distinguish this court's recent decision in *United States v. Cuthbertson*, 630 F.2d 139 (3d Cir. 1980). I find the facts too similar for distinction, and must disagree with the holding of the earlier case.

At issue in the portion of *Cuthbertson* which discussed the newsgatherers privilege was a subpoena duces tecum served by the defendants on CBS and subsequently modified by the court. The modified subpoena directed CBS to produce for the court's incamera inspection statements of certain individuals whom the government was going to use as witnesses in a criminal prose-

cution. The individuals had been interviewed by CBS personnel in connection with its program *60 Minutes*. The defendants wanted access to the unpublished statements made during the CBS interviews because they thought the statements might have some value for impeachment at trial. The individuals who had been interviewed agreed to permit disclosure of their statements. However, CBS argued that it had a qualified journalist's privilege not to reveal its resource materials, regardless of the willingness of the sources of the materials to have them revealed. This court found that the subpoenaed material was protected by the journalist's privilege.

The plurality opinion of the Supreme Court in *Branzburg v. Hayes*, 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972), did not recognize a testimonial privilege for newsmen, *Id.*, p. 690, 92 S.Ct. p. 2661. The Court was concerned that:

The administration of a constitutional newsman's privilege would present practical and conceptual difficulties of a high order . . . .

In each instance where a reporter is subpoenaed to testify, the courts would . . . be embroiled in preliminary factual and legal determinations with respect to whether the proper predicate had been laid for the reporter's appearance . . . . *Id.*, pp. 703–705, 92 S.Ct. pp. 2668–69.

This court recognized a qualified testimonial privilege in *Riley v. City of Chester*, 612 F.2d 708 (3d Cir. 1979). In *Branzburg* the Supreme Court was weighing claims asserted in support of a journalist's privilege against the needs of the public in criminal law enforcement. *Riley* was a civil suit. This circuit found that when a reporter is asked to disclose the source of *confidential* information in a civil action, there must be a threshold showing that the information is crucial to the proceeding and unavailable from another source. *Riley*, p. 717.

The most cogent argument for the recognition of a newsman's privilege is that the free flow of information to the media will be encouraged if one desiring to communicate information, but fearing exposure, can be assured that his identity will never come

to light unless he permits it. Whatever legitimacy this rationale may have, it disappears once the source willingly identifies himself and consents to disclosure of his communication. For this reason, I believe that *Cuthbertson* was an unjustified extension of the qualified privilege recognized in *Riley*.

Had I been sitting with the court when *Cuthbertson* was decided, I would have dissented. The same issue is before us again. Rather than split hairs over when the question put to a newsman seeks the identity of a confidential source or looks only to the source's motivation, I would look to the present state of the expectation of confidentiality. If that expectation no longer exists, I would hold that the privilege no longer exists.

In the case before us, Peter Vaira disclosed his contacts with Jan Schaffer and testified as to the substance of his telephone conversations with her. If his communication with her was initially confidential, it was no longer confidential when she took the stand. Because the confidentiality element was gone, I would hold that any privilege which may have existed evaporated. Thus, Schaffer should have answered the questions about her dealings with Peter Vaira related to the ABSCAM investigation.