In the Matter of the GRAND JURY EMPANELED FEBRUARY 5, 1999.

No. 99–30 NHP.

United States District Court, D. New Jersey.

May 24, 2000.

Donald A. Robinson, Keith J. Miller, Robinson, Lapidus & Livelli, Newark, NJ, for movant.

Alain Leibman, Assistant U.S. Attorney, Robert J. Cleary, United States Attorney, Newark, NJ, for respondent.

POLITAN, District Judge.

This matter comes before the Court on The Star–Ledger's motion to quash a grand jury subpoena issued by the United States Attorney's Office which requests the production of an audio tape (or audio tapes) containing an interview conducted by Star–Ledger reporters. The Court heard oral argument on October 7, 1999.[1] For the reasons set forth below, The Star–Ledger's motion to quash the grand jury subpoena is **DENIED.**

## BACKGROUND

This case arises out of the United States Attorney's Office issuing a subpoena to The Star–Ledger newspaper in which it requests audio tapes of an interview for use in a federal grand jury proceeding. The Star–Ledger is a widely distributed newspaper which serves New Jersey and is based in Newark, New Jersey. On July 18, 1997, The Star–Ledger published an article titled " 'Buyers' Got Cash In Realty Scheme" (hereinafter "the article"). The article contained statements made by Gary Grieser ("Grieser") during a two-hour interview with The Star–Ledger. In the article, Grieser described a massive and complicated real estate fraud scheme in which he was a participant whereby properties would be purchased at low prices and then immediately resold at much higher prices (known as "land flipping"). Grieser detailed how he, as president of Capital Assets, paid "straw" buyers $4,000 or more per transaction to lend their names and credit histories to the flip transactions. In order to accomplish the resales and mortgage commitments, real estate appraisers inflated the values of the subject properties. False documents were used to support loan applications, and false leases used to indicate that the properties would produce income.

A grand jury was empaneled to investigate the scheme, and, as a result, five real estate appraisers were indicted in August of 1998.[2] These five appraisers pled guilty to conspiracy charges pursuant to a plea agreement. In addition, a sales representative of Walsh Securities, a mortgage lender on a large number of the flipped properties, pled guilty to conspiracy to commit wire fraud and wire fraud. On June 11, 1999, Gary Grieser was indicted on charges of mail, wire, and bank fraud, obstruction of justice, and the use of a false social security number in acquiring various properties. Grieser's indictment concerned a smaller number of properties involved in the land-flip scheme which Grieser purchased for himself using false information.

In early November 1998, the United States Attorney's Office notified the Star–Ledger that it sought production of an audio tape recording of the Grieser interview. The Star–Ledger, without admitting that an audio tape of the interview even existed, denied the request. The government then issued a grand jury subpoena to The Star–Ledger in which it requested an edited version of the taped interview containing only the statements reported in the article.[3] The subpoena requested the following:

1. The Star–Ledger also argues that the subpoena does not satisfy the *Schofield* test as set forth by *In re Grand Jury Proceedings (Schofield I)*, 486 F.2d 85, 93 (3d Cir.1973) and *In re Grand Jury Proceedings (Schofield II)*, 507 F.2d 963, 966 (3d Cir.), *cert. denied*, 421 U.S. 1015, 95 S.Ct. 2424, 44 L.Ed.2d 685 (1975). The United States Attorney's Office submitted a *Schofield* Affidavit for the Court's *in camera* review. During oral argument, the Court held that the government's *Schofield* Affidavit satisfied the *Schofield* test.

2. A civil lawsuit was filed in the District of New Jersey against Gary Grieser and others who allegedly participated in the scheme. *See Walsh Securities, Inc. v. Cristo Property Management, Ltd.,* 7 F.Supp.2d 523 (D.N.J. 1998). The indicted appraisers in turn implicated several Walsh Securities officers in the scheme.

3. The subpoena was directed to the "Custodian of Records/*The Star–Ledger* " and was returnable June 25, 1999. The date was later adjourned by counsel to allow for a Court-approved motion and briefing schedule.

1. An audio tape containing and/or reflecting an interview conducted of Gary Grieser on or about July 17, 1997, the substance of which was published in The Star–Ledger on or about July 18, 1997 in a story reported by M. Drewniak, W. Quinn, and B. Swayze; **provided, however,** that respondent need only produce (a) a copy of the original audio tape, (b) which copy has been redacted to contain only the statements attributed to Grieser in the published story (together with the predicate questions from the reporter(s)).

2. A records custodian or other witness able to authenticate the redacted audio tape produced pursuant to the preceding paragraph.

At oral argument and in its brief, the government represented that it is in need of the audio tape only for the continuing grand jury investigation into the broader land-flipping conspiracy, and not for the Grieser prosecution.[4] The Star–Ledger contends that it is protected by the media's qualified privilege to refuse to divulge sources or news-gathering techniques.

### DISCUSSION

In rare cases, a conflict arises between the First Amendment and the criminal prosecutorial process. This tension has been described as a balance between the "freedom of the press and the obligation of all citizens to give relevant testimony with respect to criminal conduct." *Branzburg v. Hayes*, 408 U.S. 665, 710, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972). This is such a case.

The Star–Ledger argues that the indictment must be quashed because the First Amendment bestows upon it either an absolute or qualified privilege to refuse to disclose its investigative and news gathering methods and techniques. The government counters that the qualified privilege in this case must yield to the broad investigatory powers of the grand jury proceeding.

The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech, or of the press." It is grounded on "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open. . . ." *New York Times Co. v. Sullivan*, 376 U.S. 254, 270, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). It has been said that the First Amendment "was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people." *Id.* (quoting *Roth v. United States*, 354 U.S. 476, 484, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957)). Indeed, it is the press that serves as a vehicle to disseminate information to the public so that the unfettered interchange of ideas may occur.

The importance of the grand jury proceeding is similarly established. Guaranteed by the Fifth Amendment, the grand jury has the dual function of determining whether probable cause exists to believe that a crime has been committed and of protecting citizens against groundless criminal prosecutions.[5] *See Branzburg*, 408 U.S. at 686–87, 92 S.Ct. 2646. Borrowed from the English, the grand jury proceeding is rooted in the tradition and history of Anglo–American law. *See Hannah v. Larche*, 363 U.S. 420, 489–90, 80 S.Ct. 1502, 4 L.Ed.2d 1307 (1960) (Frank-

---

4. Indeed, the Star–Ledger contended at oral argument that the United States intended to use the audio tapes for the criminal trial of Gary Grieser, and that such use of the audio tapes would be improper. Grieser, however, pled guilty to all the counts in the indictment on November 23, 1999. The United States has reiterated that it intends to use the audio tapes for the on-going grand jury investigation, and, in light of Grieser's guilty plea, the Star–Ledger's concern that the United States would use the audio tapes for Grieser's prosecution has evaporated.

5. Indictment by grand jury applies in the federal context, and is not part of the due process of law guaranteed to state criminal defendants by the Fourteenth Amendment. *See Hurtado v. California*, 110 U.S. 516, 4 S.Ct. 111, 28 L.Ed. 232 (1884).

furter, J., concurring). Because the grand jury's mission is to explore the possibility of criminal conduct and to return only well-founded indictments, "its investigatory powers are necessarily broad." *Branzburg*, 408 U.S. at 688, 92 S.Ct. 2646.

## I. *The Journalist's Qualified Privilege*

■ In *Riley v. City of Chester*, 612 F.2d 708, 715 (3d Cir.1979), the Third Circuit established a qualified federal common law privilege for journalists to refuse to disclose their confidential sources. Set in the context of a civil case, the Court in *Riley* set forth a three-prong inquiry whereby the assertion of the privilege and the litigant's need for evidence would be balanced on an *ad hoc*, case-by-case basis. *See Riley*, 612 F.2d at 716. The *Riley* Court held that the materiality, relevance, and necessity of the information sought must be shown. *See id.* In so holding, the Court emphasized that the circumstances in which the issue arose must first be considered. *See id.*

■ The Third Circuit extended the reporter's qualified privilege to criminal cases in *United States v. Cuthbertson*, 630 F.2d 139, 148 (3d Cir.1980). The Court in *Cuthbertson* also expanded the *Riley* holding to protect unpublished materials held by reporters. *See Cuthbertson*, 630 F.2d at 147. Importantly, the Third Circuit, assessing the various factors a court considers when balancing the privilege against the need for evidence, noted that "the lack of a confidential source may be an important element in balancing the defendant's need for the material sought against the interest of the journalist in preventing production...." *Id.* at 147. In applying the three-prong *Riley* test, the Court concluded that film and audio tapes or written transcripts of verbatim or substantially verbatim statements made by interviewees who were on the government's witness list

were "unique bits of evidence that are frozen at a particular place and time," and found that the government's need for the evidence outweighed the privilege. *Id.* at 148.

■ In *United States v. Criden*, 633 F.2d 346, 359 (3d Cir.1980), the Third Circuit held that a journalist, summoned as a defense witness in a criminal proceeding, could not refuse to affirm or deny that she had a conversation with a particular individual who had already publicly testified that the conversation occurred. In so holding, the Court surmised that the party seeking disclosure of information "probably should be required to prove less to obtain the reporter's version of a conversation already voluntarily disclosed by the self-confessed source than to obtain the identity of the source itself." [6] *Criden*, 633 F.2d at 358; *see also Gonzales v. Nat'l Broad. Co., Inc.*, 186 F.3d 102, 109 (2d Cir.1999) (holding that when protection of confidentiality is not at stake the qualified privilege should be more easily overcome).

## II. *Application of the Riley Criteria*

In applying the three *Riley* factors to this case, this Court will strike "a proper balance between freedom of the press and the obligation of all citizens to give relevant testimony with respect to criminal conduct." *Criden*, 633 F.2d at 357 (quoting *Branzburg*, 408 U.S. at 710, 92 S.Ct. 2646). Moreover, the Court is mindful of the following instructive observations. First, as the *Riley* Court admonished, this Court must "consider first the circumstances in which the issue arose." *Riley*, 612 F.2d at 716.

Surveying the specific circumstances of this case, the Court notes that, unlike *Cuthbertson*, this case implicates published information, and not confidential, unpublished information. Also unlike *Cuthbert-*

---

**6.** Indeed, the Ninth Circuit similarly held that the privilege should be more easily overcome where the information sought is nonconfidential, relying specifically upon, and quoting from, the *Cuthbertson* case for support of that proposition. *See Shoen v. Shoen*, 48 F.3d 412, 416 (9th Cir.1995).

*son,* this case deals with a self-avowed source whose identity is publicly known. In addition, unlike *Riley,* this case involves a federal grand jury proceeding.[7] It is also understood that this is not a case where the government is seeking the reporters' personal notes or files.

The Court further recognizes that the scope of the qualified privilege is circumscribed by the purposes it serves. Logic and fairness demand that "[t]he rule follows where its reason leads; where the reason stops, there stops the rule." *Criden,* 633 F.2d at 356 (citing *United States v. Schreiber,* 599 F.2d 534, 537 (3d Cir. 1979)).

■ And lastly, the government is required to prove less to obtain the information where, as here, the reporter's version of the conversation was already voluntarily disclosed by the self-confessed source. *See id.* at 358; *Cuthbertson,* 630 F.2d at 147.

■■ With the foregoing in mind, the Court next applies the three *Riley* factors. The Court in *Riley* suggested a "delicate balancing" of the two interests, in which the materiality, relevance, and necessity of the information sought must be demonstrated. *See Riley,* 612 F.2d at 717. First, the government must demonstrate that it has made an effort to obtain the information from other sources. *See Criden,* 633 F.2d at 358–59. Quite obviously, another source in this case is the actual published article itself. The article contains the written version of the taped conversation between the Star–Ledger reporters and Grieser.

The government has attempted to obtain the information it requires from the article. However, as the government articulated during oral argument, the actual published article is not sufficient. The printed article is not the equivalent of the audio tape and must be distinguished from

the audio tape containing the interview from which the quotes in the article derived from. In order for the grand jury to properly assess the evidence, it must be able to hear the actual conversation between the reporter and Grieser, and not just read mere snippets of the interview printed in the article.

Simply put, there is a world of difference between cold and lifeless written words on paper and the sound of a live, verbal conversation. A live conversation permits the listener to judge certain credibility aspects of the speakers. For example, in *Criden* a United States Attorney was interviewed by a reporter. During the trial, the reporter was asked to answer certain questions regarding the conversation. Although the United States Attorney had already testified and admitted that he was in fact the interviewee, the Third Circuit concluded that this testimony was not sufficient because "[the reporter] is the most logical source of information about the conversation ... because she was the other participant in it." *Criden,* 633 F.2d at 359. Thus, the Court required the reporter to answer questions regarding the conversation.

The Court in *Criden* emphasized that the evidence would be unobtainable elsewhere because only the reporter would be able to testify to the interviewee's credibility with respect to the conversation. *See id.* Although in this case the reporter is not being asked to testify, the essence of the audio tape here—live, verbal conversation—is no different than live testimony for purposes of this inquiry. In fact, listening to the actual audio version of the conversation may be more effective for purposes of the grand jury's task than listening to a reporter's recollection of the conversation. Therefore, inasmuch as the published article is insufficient as evidence for the grand jury, the government has satisfied the first criterion.

7. Notably, the *Criden* Court also distinguished the facts presented in that case from *Cuthbert-* *son* and *Riley. See Criden,* 633 F.2d at 348.

Secondly, the government must show that the only access to the information sought is through the journalist and the source. *See Criden*, 633 F.2d at 359. The facts of this case are somewhat different in that the government is seeking the journalist's audio tape, and not the journalist's testimony or identification of a confidential source. Nevertheless, this analysis is the same as that for the first criterion. The Star–Ledger argues that the government has an alternative source to obtain its information—namely, the published article. As stated above, however, the article is not the equivalent of the tape and must be distinguished from the audio tape. What is sought by the government is not so much "what" was said in the article but more so "how" it was said. Here, much like in *Criden*, only by listening to the audio tape will the grand jury be able to evaluate Grieser's credibility. This particular quality of the conversation can only be experienced by listening to the audio tape itself. Much like *Cuthbertson*, the audio tape represents "unique bits of evidence that are frozen at a particular place and time." *Cuthbertson*, 630 F.2d at 148. Therefore, the government has no other source from which they can acquire this insight.

Relevance and importance to the particular proceeding is the final criterion under *Riley*. *See Criden*, 633 F.2d at 359. Although *Criden* intimated that the party seeking the privileged information must demonstrate that the information is "crucial" to the claim, the government need not satisfy such a high burden in this case. The seeker of information is required to prove less where, as here, the information sought is nonconfidential and the source self-avowed. *See id.* at 358; *Cuthbertson*, 630 F.2d at 147. Accordingly, the government should only have to establish that the information sought is necessary for the grand jury's purposes.

The government has satisfied the final criterion. The purpose of the grand jury is to sift through evidence and determine whether crimes were committed. Clearly the motivation and credibility of Grieser are pertinent to the grand jury's deliberations. Only by listening to the audio tape will the panel be able to appraise the credibility of Grieser's "story" as to the broader real estate scheme and other conspirators involved. In light of the grand jury's purpose and broad investigatory powers, then, the contents of the audio tape are germane to the determination of whether crimes were committed. The audio tape is necessary to the grand jury's investigation of the real estate scheme described by Grieser in the Star–Ledger's audio tapes. Accordingly, the government has met all the *Riley* factors and, therefore, the Star–Ledger must comply with the grand jury subpoena by providing those portions of Grieser's interview contained in the audio tape that are delineated in the subpoena.[8]

### CONCLUSION

For the aforementioned reasons, The Star–Ledger's motion to quash the grand jury subpoena is **DENIED.** Accordingly, The Star–Ledger must comply with the government's grand jury subpoena requesting a redacted copy of the audio tape containing Grieser's interview with Star–Ledger reporters. An appropriate Amended Order accompanies this Letter Opinion.

---

8. The Court notes in passing that it is arguable *Riley* and *Cuthbertson* are inapplicable in this case. This case, unlike *Riley* and *Cuthbertson*, involves nonconfidential information and a self-confessed source. Thus, it is likely that the *Riley* Court's concern regarding the journalist's ability to obtain information on a confidential basis dissipates where, as here, nonconfidential information is sought from a self-confessed source. *See Criden*, 633 F.2d at 361 (Rambo, J., concurring).