James **DAMIANO**, Plaintiff,

v.

**SONY MUSIC ENTERTAINMENT, INC., and Bob Dylan, Defendants.**

Civil No. 95–4795 (JBS).

United States District Court, D. New Jersey.

Aug. 6, 1996.

---

**487**

Steven M. Kramer, Steven M. Kramer & Assoc., New York City, for Plaintiff.

Steven D. Johnson, Hecker Brown Sherry and Johnson, Haddonfield, NJ, for Sony Music Entertainment Inc. And Bob Dylan.

John C. Connell, Archer & Greiner, P.C., Haddonfield, NJ, Non–Party Witness, The Associated Press.

## OPINION

ROSEN, United States Magistrate Judge.

Presently before the court is the motion of Steven D. Johnson, Esquire, counsel for the defendants, Sony Music Entertainment Inc. and Bob Dylan, for a protective order to designate all discovery material as confidential information pursuant to Rule 26(c), Fed. R.Civ.P., and Rule 15(F), General Rules for the District of New Jersey. Also before the court are several motions by Steven M. Kramer, Esquire, counsel for the plaintiff, James Damiano:

a. for an order compelling production of documents from defendants Sony Music Entertainment and Bob Dylan;

b. for an order enforcing a subpoena served upon the Associated Press compelling an interview tape of defendant;

c. for an order compelling Bob Dylan to consent to production of the Associated Press;

d. for an order compelling production of press clipping binders from the defendants.

After careful consideration of the parties' submissions, and after further consideration of the oral argument conducted on the record on July 16, 1996, and for the reasons during oral argument and further stated below the following dispositions of the pending motions shall be entered: (i) the defendants' motion for a protective order shall be *granted;* (ii) the plaintiff's motions to compel documents from the defendants and enforce the subpoena served on the Associated Press shall be *denied;* (iii) the plaintiff's motion to compel Bob Dylan to consent to production of the Associated Press's taped interview shall be *denied;* and (iv) the plaintiff's motion to compel production of press clipping binders shall be *granted.*

## FACTUAL AND PROCEDURAL HISTORY

In this action, the plaintiff seeks legal and equitable relief for alleged violations of federal and state statutory and common law. The plaintiff's original complaint alleges that acts of the defendants, Sony Music Entertainment Inc. (hereinafter "Sony") and Bob Dylan, constituted copyright infringement in violation of federal copyright law, 17 U.S.C. § 101. (Complaint, Count I). Additionally, the plaintiff charged the defendants with violation of section 43(a) of the Lanham Act for false designation of origin, misappropriation of property, breach of confidence, fraud, and mail fraud. (Complaint, Counts II, III, IV, V and VI).

James Damiano alleges that beginning in 1982 he submitted, upon request, written materials to CBS Records (subsequently acquired by Sony). (Complaint ¶ 6). Mr. Damiano alleges that Sony released versions of his songs, falsely attributing authorship to Bob Dylan. (Complaint ¶ 6). The plaintiff further alleges that Mr. Dylan used the material because Dylan was suffering from writer's block, regarding which the plaintiff has submitted a transcript of an interview where Dylan allegedly admitted to having writer's block. (Complaint ¶ 13). Plaintiff also submits that Dylan "didn't have enough material for his album", so he used Damiano's written works. (Complaint ¶ 13). The recordings were released in 1989, 1990, 1994 and 1995 on albums, C.D.'s, and videos, and are currently being sold in interstate commerce. (Complaint ¶ 6).

Mr. Damiano alleges that, beginning in 1988, Sony repeatedly requested written material from him, and Mr. Damiano complied. (Complaint ¶ 14). The plaintiff asserts that "these are among the materials that were subsequently infringed." (*Id.*). As a result of the alleged unlawful activity, the plaintiff is seeking damages and injunctive relief against the defendants jointly and severally. (Complaint p. 32).

On September 15, 1995, the plaintiff filed the instant action in the United States District Court for the District of New Jersey, Camden Vicinage. On January 5, 1996, the Honorable Jerome B. Simandle, trial judge in this case, ordered that the case be bifurcated on the issues of liability and damages. On January 22, 1996, this court ordered that (i) the parties shall complete factual discovery by March 29, 1996, and (ii) the court shall conduct a pretrial conference on April 9, 1996. By orders of April 9, 1996, this court extended certain deadlines: factual discovery was to be completed by June 28, 1996, and a final pretrial conference was ordered for July 16, 1996.

On March 14, 1996, the defendants were granted an order to protect certain confidential information and proprietary material in the possession of the defendants, both during discovery and at trial. Subsequently, on May 10, 1996, the Defendants filed the instant motion to amend the confidentiality order pursuant to Rule 26(c), Fed.R.Civ.P., and, Rule 15(F), General Rules for the District of New Jersey (hereinafter "Local Rule").

The court must determine the propriety of amending the original protective order to designate all deposition transcripts and any other discovery materials as confidential and whether compelling the production of documents from the defendants and the tape recorded interview from the Associated Press, is proper. Additionally, the court must determine whether compelling Mr. Dylan to consent to the production of the AP's tapes, and compelling the production of the defendants' press clipping binders is appropriate.

## DISCUSSION

### I. Defendant's Motion to Designate All Discovery Materials Including Deposition Transcripts as Confidential Information

The defense submits that all deposition transcripts and other discovery materials should remain confidential for two reasons. First, the defendants claim the plaintiff will seek to "commercially exploit his allegations against Bob Dylan in the media and elsewhere." (Affidavit of Orin S. Snyder, Esquire, in Support of the Defendants' Motion For a Protective Order ¶ 2) (hereinafter "Snyder Affid."). Secondly, the defense fears that because of a ready market for

unpublished information about Bob Dylan, Mr. Damiano will use discovery information for personal pecuniary gain, while causing Bob Dylan unnecessary harm.

The plaintiff has submitted an unpublished manuscript he has written, entitled "Eleven Years", to various media groups, and has also placed an advertisement for it in *Rolling Stone* magazine. (Snyder Affid. ¶ 3). The defendants contend that this manuscript contains information concerning the allegations against Bob Dylan in this case. (*Id.*). The plaintiff has further entered into a written commercial agreement with Nicholas Kuntz concerning the plaintiff's manuscript. The agreement reads in pertinent part:

> This is to certify that on this day January 28th, 1994 that James Damiano assigns the monetary settlement of any legal issues awarded to James Damiano regarding his legal suite [sic] involving CBS Records and/or Bob Dylan to both Nicholas G. Kuntz and James Damiano cooperatively and any and all profits ... are to be shared and distributed equally.
>
> The sale and or development of any project based upon the property "Eleven Years," ... for the mediums of publishing, recording, video, television or film shall be developed, produced, and distributed through the mutual efforts of this alliance ... and no other rights regarding the property "Eleven Years" for the purposes of publishing, recording, video, television or film development, production or distribution may be assigned or acted upon without the express written consent of both parties.

(Anyder Affid. ¶ 4). Mr. Kuntz has admitted to the existence of this agreement, as well as his and the plaintiff's joint desire to one day make money from Damiano's allegations. (Deposition of Nicholas Kuntz attached as Exhibit D to Snyder Affid. at 154:6–12) (hereinafter "Kuntz Dep."). The defense claims that the agreement creates an inference that Mr. Damiano and persons acting with him are attempting to use discovery information for economic gain before the lawsuit has been resolved. (Snyder Affid. ¶ 6). The defense asserts that if the depositions and other discovery materials are not or-

dered confidential, they will certainly be exploited, and thus will be an invasion of Mr. Dylan's privacy and rights. (*Id.* ¶ 8).

In opposition, the plaintiff argues that the defendants' motion should be denied because the defendants failed to file or serve a memorandum of law. (Letter from Plaintiff to the Court dated 6/5/96). The defense counters that a memorandum of law is not obligatory under Local Rule 12(c). (Letter from Defendants to the Court dated 6/5/96). In addition, the defense asserts that the plaintiff failed to file opposition papers in a timely fashion. The plaintiff's opposition letter states in full:

> Because defendant's motion to designate materials as confidential filed May 10 is defective for failure to file or serve a memorandum of law, I ask that the court disregard it. As the deadline for that motion was May 10, defendants are precluded from re-filing it.

(Letter from Plaintiff to the Court of 6/5/96).

█ Although the plaintiff is correct that a moving party must either file a memorandum of law or state that a memorandum of law is not necessary, *Dascoli v. United States Postal Service*, Civ. No. 92–2549 (Sarokin) (D.N.J. slip op. filed November 17, 1992), the defense's Notice of Motion stating that the motion "is based on the accompanying affidavit of Orin S. Snyder, Esquire and the accompanying exhibits" adequately fulfills this requirement. Moreover, if the court were to dismiss this motion, the defense could file another motion seeking confidentiality. Thus a dismissal does not dispose of this issue. Therefore the court will not dismiss the motion based upon the response submitted by the plaintiff. Additionally, the plaintiff's letter was filed late, therefore it does not compel consideration by the court. *See* Local Rule 12(c).

## A. *To Modify an Existing Protective Order the Court Must First Address a Balancing Test*

█ The Third Circuit has recognized that it is axiomatic that a district court retains the power to modify or lift confidentiality orders that it has entered. *Pansy v.*

*Borough of Stroudsburg,* 23 F.3d 772, 784 (3d Cir.1994) (citing cases). Rule 26(c) of the Federal Rules of Civil Procedure codifies a court's power to protect information from disclosure, and places the burden of demonstrating good cause to preclude or limit discovery on the party seeking the protective order.[1] *Glenmede Trust Company v. Thompson,* 56 F.3d 476, 483 (3d Cir.1995); *Cipollone v. Liggett Group, Inc.,* 785 F.2d 1108, 1121 (3d Cir.1986), *cert. denied,* 484 U.S. 976, 108 S.Ct. 487, 98 L.Ed.2d 485 (1987). The court in *Cipollone* elaborated on the applicable standard for protective orders:

> To overcome the presumption [in favor of discovery], the party seeking the protective order must show good cause by demonstrating a particular need for protection. Broad allegations of harm, unsubstantiated by specific examples or articulated reasoning, do not satisfy the Rule 26(c) test. Moreover, the harm must be significant, not a mere trifle.

*Id.* (citations omitted). Moreover, the burden of establishing the propriety of a protective order rests with the party asserting that privilege. *In re Bevill, Bresler & Schulman Asset Management Corp.,* 805 F.2d 120, 126 (3d Cir.1986).

In *Pansy,* the Third Circuit reaffirmed the strong presumption against entering and maintaining confidentiality orders. 23 F.3d at 792. Therein, the court required that prior to entering protective orders, district courts clearly articulate that good cause requires protection of the discovery involved. *Id.* at 786; *see also Glenmede Trust Company v. Thompson,* 56 F.3d 476, 483 (3d Cir. 1995) ("A party seeking a protective order over discovery materials must demonstrate that 'good cause' exists for the protection of that material."). The court also recognized that although the district court is best situated to determine what factors are relevant to the dispute, ... the analysis should always reflect a balancing of private interests versus public interests—

Discretion should be left with the court to evaluate the competing considerations in light of the facts of individual cases. By focusing on the particular circumstances in the cases before them, courts are in the best position to prevent both the overly broad use of [protective] orders and the unnecessary denial of confidentiality for information that deserves it.

*Glenmede Trust,* 56 F.3d at 483 (quoting Arthur R. Miller, Confidentiality, Protective Orders, and Public Access to the Courts, 105 Harv.L.Rev. 427, 492 (1991)).

As the Third Circuit has stated, "'[g]ood cause is established on a showing that disclosure will work a clearly defined and serious injury to the party seeking closure. The injury must be shown with specificity.'" *Id.* (quoting *Publicker Industries, Inc. v. Cohen,* 733 F.2d 1059, 1071 (3d Cir. 1984)). To quantify the injury, the court in *Pansy* recognized several factors—neither mandatory nor exhaustive—that may be considered in evaluating whether "good cause" exists. *Pansy,* passim; *Glenmede,* 56 F.3d at 483. Factors weighing in favor of disclosure include:

(i) whether the information sought is "important to public health and safety" (*Pansy,* 23 F.3d at 787);

(ii) whether the information would "promote fairness and efficiency" among litigants (*id.*);

(iii) whether the case involves issues important to the public or of legitimate public concern (*id.*); and

(iv) whether the party benefitting from the order of confidentiality is a public entity or official (*id.*).

Factors weighing in favor of confidentiality include:

(i) whether disclosure would violate privacy interests of the party seeking protection, including the presence of common law and statutory privileges; and

---

**1.** Rule 26(c) states in pertinent part that "[u]pon motion by a party or by the person from whom discovery is sought, ... and for good cause shown, the court in which the action is pending

... may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense[.]"

(ii) in instances of modification of a previously entered order, whether there was reliance on that order (*id.* at 788–790).

In the present confidentiality order, "confidential information" is defined as "any and all documents or data produced by any party in this action and designated as confidential[.]" (Protective Order, ¶ 2(a)). The protective order filed on March 14, 1996, limits disclosure of confidential information to "Qualified Persons" only.[2] Any information considered confidential by either party "shall be produced or otherwise disclosed in a sealed envelope or other appropriate sealed container on which shall be endorsed the information provided in paragraph [5](b)."[3] (Protective Order ¶ 3). Each person, other than counsel, who obtains Confidential Information, must sign a copy of the Protective Order. (Protective Order ¶ 5(a)). If a party wants to disclose confidential information to persons other than Qualified Persons, they must submit a statement identifying the confidential information to opposing counsel. The opposing counsel then has 30 days after receiving notice to object to the specific disclosure. (Protective Order ¶ 6).

▮ The defendants argue that Mr. Damiano has sought to commercially exploit his allegations against Bob Dylan. They further assert that a willing market does exist to assist the plaintiff with the distribution of his unpublished manuscript. (Snyder Affid. ¶ 2). The defendants' express concern is that Mr. Damiano can take raw discovery from this case and use it in his manuscript. (*Id.* at ¶ 6–8). The plaintiff has not provided any substantive argument against labeling discovery materials as confidential. Nevertheless, the Third Circuit has required that courts carefully consider the balancing test discussed *supra*, prior to requiring disclosure. *Pansy*, 23 F.3d at 792 (recognizing that the

strong presumption against protective orders necessitates a balancing of interests).

### 1. *Factors in Favor of Disclosure*

Two factors to consider are (i) whether the information sought is important to the public's health and safety, and (ii) whether it involves any legitimate public concern. If the parties or issues are of a public nature, and are matters of legitimate public concern, that should be a factor weighing in favor of disclosure. *Pansy*, 23 F.3d at 788. On the other hand, "[w]here the parties are private, the right to rely on confidentiality in their dealings is more compelling than where a government agency is involved[.]" *City of Hartford v. Chase*, 733 F.Supp. 533, 536 n. 5 (D.Conn.1990), *rev'd on other grounds*, 942 F.2d 130 (2d Cir.1991). In this case, Bob Dylan being a private citizen, and the allegations put forth by the plaintiff being a private matter, the discovery materials pose no threat to public health and safety. Furthermore, any allegations about Bob Dylan's personal business affairs constitute no legitimate public concern.

Secondly, the court must decide whether or not disclosure should be ordered if the party benefitting from the order of confidentiality is a public entity or official. Bob Dylan is a public figure. However, he is a private citizen and not a public official. In *Pansy*, the Third Circuit states: "if a case involves private litigants, and concerns matters of little legitimate public interest, that should be a factor weighing in favor of granting or maintaining an order of confidentiality." 23 F.3d at 788. This factor provides a natural nexus with the other factors regarding public interest and concern. *See, City of Hartford v. Chase*, 733 F.Supp. 533, 536 (D.Conn.1990), *rev'd on other grounds*, 942 F.2d 130 (2d Cir.1991). The court recognizes that Mr. Dylan is not a public official, nor

---

2. The term "Qualified Person" refers to: (i) a judge or magistrate judge and his or her staff; (ii) any referee appointed by a judge; (iii) court reporters engaged in this litigation; (iv) counsel for each party; (v) consultants, paralegals and stenographic, clerical, legal and secretarial personnel employed by respective counsels; (vi) any party to this action; and (vii) any person employed by counsel for any of the parties to assist

counsel in these proceedings. (Protective Order ¶ 2(c)).

3. The sealed envelope or container shall be endorsed "*James Damiano v. Sony Music Entertainment Inc. and Bob Dylan*, Confidential Information ... Pursuant to Order—Case No. Civ. 4795 (JBS)." (Protective Order ¶ 5(b)).

does any matter in this case pose any danger or concern to the public.

Finally, the last factor the court must consider is whether the information would promote fairness and efficiency among the litigants. Both parties have equal access to all discovery materials, thus fairness and efficiency among the litigants is not an issue. However, if the plaintiff were allowed to commercially exploit discovery materials (i.e. deposition transcripts) through the media before any issues have been decided, it would constitute an unfair and highly prejudiced disadvantage to the defendants. Any public access to allegations concerning a celebrity may jeopardize a fair hearing if the case were to go to trial. Moreover, if the court were to protect all discovery motions from the public, each litigant would still have equal access to these documents, and neither party would have an advantage over the other.

### 2. *Factors in Favor of Confidentiality*

The court now must address the factors in favor of confidentiality. First, the court must consider whether disclosure would violate the privacy interests of the party seeking protection. The Third Circuit noted that "it is appropriate for courts to order confidentiality to prevent the infliction of unnecessary or serious pain on parties who the court reasonably finds are entitled to such protection." *Pansy,* 23 F.3d at 787. Consequently, it is important that the court consider whether the information is being sought for legitimate or improper purposes. *Id.*

The defense asserts that based on the written agreement between Mr. Damiano and Mr. Kuntz, the plaintiff intends to publicize the discovery materials. (Snyder Affid. ¶ 5). In fact, the defense claims that Mr. Damiano already has placed advertisements for his unpublished manuscript in *Rolling Stone* magazine. (Snyder Affid. ¶ 3). The plaintiff has also allegedly submitted copies of his manuscript to "A Current Affair" television show and *The New Yorker* magazine. (*Id.*) The plaintiff has not denied any of these allegations. Further, based on the contract between Mr. Damiano and Mr. Kuntz, it appears likely that depositions and other documents may be publicized. The

notion of using raw discovery materials for financial profit is not what this court considers to be a legitimate purpose for disclosure.

Every lawsuit has the potential to create some adverse publicity for one of the parties. *Vassiliades v. Israely,* 714 F.Supp. 604, 606 (D.Conn.1989). However, in this case, the adverse publicity is at the core of the undecided issue. The defense states that "[a] party should not be permitted to sue a celebrity, conduct discovery, and then profit from the sale of discovery materials related to the lawsuit, particularly where the allegations remain unproven." (Snyder Affid. ¶ 11). There clearly exists a possible invasion of Mr. Dylan's privacy rights.

Under *Cipollone,* the party seeking a protective order must show good cause by stating specific examples of potential harm. 785 F.2d at 1121. In response to *Cipollone,* the defense offers prior episodes of public exploitation in Bob Dylan's career:

(a) in the 1970's an individual rummaged through Mr. Dylan's trash and published what he had found;

(b) there have been approximately 200 unauthorized, "bootleg" CDS issued of Mr. Dylan's compositions;

(c) many personal materials relating to Mr. Dylan, such as his answering machine message, have been sold without Mr. Dylan's authorization or consent.

(Snyder Affid. ¶ 7). These examples illustrate the defendant's reasonable conclusion that it is possible for this plaintiff to inappropriately exploit any discovery materials contained in the case. The defendants have demonstrated that Bob Dylan's privacy and reputation are in danger if any raw discovery materials in this case are allowed to be disclosed to the public at this juncture. As a result, the court finds that there is no legitimate purpose in opening to public scrutiny the discovery materials as such disclosure may unfairly invade the privacy of Mr. Dylan.

The final determinant of the balancing test is whether or not there was reliance on the previously entered protective order. The original order did not concern the confidentiality of depositions and related discovery

material. Therefore, no party relied upon their continued confidentiality or discoverability. Moreover, as discussed above, any reliance by the plaintiff that the depositions would not be subject to a confidentiality order is insupportable.

Because the balancing test is vague and not exhaustive, "[d]iscretion should be left to the court to evaluate ... the facts of individual cases." *Pansy,* 23 F.3d at 789 (quoting *Miller,* 105 Harv.L.Rev. at 492). This court finds that after weighing both arguments in light of the good cause balancing test, modification of the original protective order is appropriate and the defendant's motion to designate discovery materials as confidential shall be *granted.* Of course, the plaintiff is free to utilize the materials in preparing and presenting this case in the judicial forum— not the forum of sensationalized media exposé.

## II. *Plaintiff's Motion to Compel Discovery for Unit Sales Information, and Other Documents Concerning Bob Dylan's Career*

■ The plaintiff moves to compel the defendants to produce documents concerning unit sales information (excluding dollar information) concerning Bob Dylan's albums during the relevant time period. (Plaintiff's Brief at I) (hereinafter "P's Br."). The plaintiff asserts that by charting the sales of the pertinent Bob Dylan albums, they can prove that he went through a "dry spell". The plaintiff maintains that the defense could argue at trial that because album sales were so dismal, the absence of a gold record does not prove Mr. Dylan had a period of low artistic productivity. *Id.*

Discovery related to damages in this phase of the action is not appropriate in light of the Bifurcation Order. Judge Simandle ordered a bifurcation of the issues because the relevant information on damages would involve complicated and time consuming issues. The defense has advised counsel for the plaintiff that they would be "willing to provide him with information regarding which of Bob Dylan's albums went 'Gold' during the relevant time period[.]" (Affidavit of Orin S. Snyder in Opposition to Plaintiff's Motion to Compel

Discovery ¶ 4) (hereinafter "Snyder Affid. II").

This court recognizes that sales data is relevant for a market analysis. However, sales figures do not necessarily reflect one's artistic proliferation. Public opinion of one's artistry, if it relates to one's productivity, does so only coincidently. It is possible for Bob Dylan to go through the most prolific period of his career, and coincidently suffer from the lowest sales in his career due to the public's dislike for his material.

Under the Bifurcation Order, the plaintiff's motion compelling any information concerning sales units is *denied* until the issue of damages is reached. The information requested is unduly burdensome and only remotely related to the plaintiff's "dry spell" theory.

Second, the parties have informed the court that the following requests under this motion have been resolved:

(i) to compel disclosure of documents revealing the reasons for the decision to release Bob Dylan's "Greatest Hits" albums (P's Br. at II);

(ii) to compel disclosure of documents discussing the status of Bob Dylan's career and attempts to jump start it (*id.* at III).

These two requests are hereby dismissed as moot. As a result, this court holds that the previous motion is *denied* in part and *dismissed* in part as moot.

## III. *The Plaintiff's Motion to Compel Associated Press to Disclose the Tape Recorded Interview with Bob Dylan*

The plaintiff asserts that there exists a compelling need to disclose a tape recorded interview of Bob Dylan conducted by Associated Press reporter Kathryn Baker. (Plaintiff's Brief in Support of Motion to Compel Enforcement of Subpoena Served Upon the AP ¶ 8) (hereinafter "P's Br. II"). The plaintiff argues that the tape will prove Mr. Dylan had a "motive for stealing plaintiff's songs." (*Id.*) The plaintiff bases "motive" on the allegation that Mr. Dylan admitted to having difficulty writing original music at precisely the same time Mr. Damiano alleges his music was stolen. (*Id.*) Additionally, the plaintiff

submits that the jury should hear the tape with Mr. Dylan's voice on it rather than be required to weigh Ms. Baker's present testimony against Mr. Dylan's. (*Id.*)

The AP argues that under the federal common law the tapes are protected from disclosure. (Brief of Associated Press in Opposition to Plaintiff's Motion to Compel Tape Recorded Interview at I) (hereinafter "AP's Brief"). Specifically, they assert that the First Amendment to the United States Constitution confers an absolute privilege to a reporter's underlying materials. (*Id.* at p. 10). The AP argues alternatively that even if the reporter's privilege extends only a qualified privilege, Mr. Damiano has failed to show sufficient need for disclosure. (*Id.* at III). First, the AP contends that the "subpoenaed information is not materially relevant to plaintiff's claims." (*Id.* at III(A)). Second, they submit that the tape recorded interview is not essential to the plaintiff's claims. (*Id.* at III(B)). Finally, the AP declares that the plaintiff has alternative sources and has failed to utilize them.

### A. The Plaintiff's Motion to Compel is Governed by Federal Privilege Law.

The plaintiff is claiming six counts against the defendants. The first count is for copyright infringement, which is governed by federal statute, 17 U.S.C. § 101. The remaining five claims (i) violation of section 43(a) of the

Lanham Act for false designation of origin; (ii) misappropriation of property; (iii) breach of confidence; (iv) fraud; and (v) mail fraud, all relate to the same general issue.

■ The issue is whether or not the defendants illegally stole the plaintiff's copyrighted material. All of the latter five claims have the same correlation to the issue as the initial claim of copyright infringement. In fact all five claims rely directly upon the initial claim. In a similar case, the Second Circuit held that "the federal law of privileges controls the question whether the privileges asserted ... should be recognized." *von Bulow v. von Bulow*, 811 F.2d 136, 141 (2d Cir.), *cert. denied sub nom Reynolds v. von Bulow*, 481 U.S. 1015, 107 S.Ct. 1891, 95 L.Ed.2d 498 (1987) (federal law of privileges governs in initial federal question with pendant state law claims). Similarly, in *Wm. T. Thompson v. General Nutrition Corp.*, 671 F.2d 100 (3rd Cir.1982), an action concerning the accountant-client privilege, the Third Circuit applied federal law when considering both federal and state law claims. The court in *Thompson*, stated that the controlling rule of law is Rule 501,[4] Fed.Rule of Evidence. 671 F.2d at 104. Consequently, as all of the plaintiff's pendant state law claims are intimately connected to the initial allegation of copyright infringement, federal privilege law will be applied.[5]

---

**4.** The court cited the legislative history of Rule 501:

[i]t is also intended that the Federal Law of privileges should be applied with respect to pendent State law claims when they arise in a Federal question case.

*Thompson*, 671 F.2d at 104 n. 5 (quoting S.Rep. No. 93–1277, *reprinted in*, [1974] U.S.Code Cong. & Ad.News 7051, 7059 n. 16).

**5.** Notwithstanding that federal law governs this case, this court will take note of the applicable New Jersey state law. The newsman's privilege in New Jersey is protected by the New Jersey Shield Law which states in pertinent part:

[A] person ... engaged in, connection with, or employed by news media for the purpose of gathering, procuring, transmitting, compiling, editing or disseminating news for the general public ... has a privilege to refuse to disclose, in any legal or quasi legal proceeding[.] N.J.S.A. 2A:84A–21 (1977).

The New Jersey Supreme Court has broadly interpreted the state newsman's privilege. *In re*

*Farber*, 78 N.J. 259, 394 A.2d 330, *cert. denied sub nom New York Times Co. v. New Jersey*, 439 U.S. 997, 99 S.Ct. 598, 58 L.Ed.2d 670 (1978). "We have held that the New Jersey Shield Law, N.J.S.A. 2A:84A–21, protects confidential information gathered by news media 'to the greatest extent permitted by the Constitution of the United States and that of the State of New Jersey.'" *Maressa v. New Jersey Monthly*, 89 N.J. 176, 181, 445 A.2d 376, *cert. denied*, 459 U.S. 907, 103 S.Ct. 211, 74 L.Ed.2d 169 (1982) (quoting *Farber*, 78 N.J. at 270, 394 A.2d 330).

Although the United States Supreme Court has changed the federal newsman's privilege from "absolute" to "qualified", *See infra*, the New Jersey privilege is still absolute. *Riley v. City of Chester*, 612 F.2d 708, 715 (3rd Cir.1979); and *Maressa*, 89 N.J. at 187, 445 A.2d 376. In concluding the New Jersey Supreme Court held that "the New Jersey Shield Law affords newspersons an absolute privilege not to disclose confidential sources and editorial processes, absent any conflicting constitutional right." *Maressa*, 89 N.J. at 189, 445 A.2d 376.

**B.** *A Reporter has a "Qualified" Privilege to Protect His/Her News Gathering Material.*

Both the Third Circuit and the United States Supreme Court have recognized a reporter's privilege as grounded in the First Amendment of the United States Constitution. *United States v. Criden,* 633 F.2d 346 (3rd Cir.1980), *cert. denied sub nom. Schaffer v. United States,* 449 U.S. 1113, 101 S.Ct. 924, 66 L.Ed.2d 842 (1981). In *Criden,* the court stated, "[t]he First Amendment 'was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people,'" *id.* at 355 (quoting *Roth v. United States,* 354 U.S. 476, 484, 77 S.Ct. 1304, 1308, 1 L.Ed.2d 1498 (1957)), "and bottomed on 'a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open[.]'" *Criden,* 633 F.2d at 355 (quoting *New York Times Co. v. Sullivan,* 376 U.S. 254, 270, 84 S.Ct. 710, 721, 11 L.Ed.2d 686 (1964)).

The court has explained the reporter's privilege as a natural extension from the principle that "without some protection for seeking out the news, freedom of the press could be eviscerated". *Branzburg v. Hayes,* 408 U.S. 665, 681, 92 S.Ct. 2646, 2656, 33 L.Ed.2d 626 (1972). A lack of protection "will jeopardize the journalist's ability to obtain information on a confidential basis." *Baker v. F & F Investment,* 470 F.2d 778, 782 (2d Cir.1972), *cert. denied,* 411 U.S. 966, 93 S.Ct. 2147, 36 L.Ed.2d 686 (1973). In addition, courts in this circuit have recognized that "compelled production of a reporter's resource materials is equally as invidious as the compelled disclosure of his confidential informants." *Altemose Constr. Co., v. Building and Constr. Trades Council,* 443 F.Supp. 489, 491 (E.D.Pa.1977) (quoting *Loadholtz v. Fields,* 389 F.Supp. 1299, 1303 (M.D.Fla. 1975)).

The Supreme Court in *Branzburg v. Hayes,* stated that the "journalists privilege ... must be considered in the context of Supreme Court teachings that there is no absolute right for a newsman to refuse to answer relevant and material questions asked during a criminal proceeding." 408 U.S. at 690–91, 92 S.Ct. at 2661–62. The Supreme Court stated that "although the courts 'have shown a special solicitude for freedom of speech and of the press, we have eschewed absolutes in favor of a more delicate calculus that carefully weighs the conflicting interests to determine which demands the greater protection under the particular circumstances presented.'" *Smith v. Daily Mail Publishing Co.,* 443 U.S. 97, 106, 99 S.Ct. 2667, 2672, 61 L.Ed.2d 399 (1979) (Rehnquist, J., concurring) (quoted in *Criden,* 633 F.2d at 357). The Third Circuit has adopted the general rule in *Branzburg v. Hayes,* stating that a claim of privilege should be "judged on its facts by the striking of a proper balance between freedom of the press and the obligation of all citizens to give relevant testimony[.]" 408 U.S. at 710, 92 S.Ct. at 2671.

In *Riley v. City of Chester,* 612 F.2d 708 (3rd Cir.1979), the Third Circuit held that based on the First Amendment, "journalist's have a federal common law privilege, albeit qualified, to refuse to divulge their sources." *Id.* at 715. In *Riley,* a non-party journalist was subpoenaed as a witness in a civil suit. In *United States v. Cuthbertson,* 630 F.2d 139 (3rd Cir.1980), a criminal case, the Third Circuit held that the reporter's privilege "does not change because a case is civil or criminal." 630 F.2d at 146. Therefore, the court in *Cuthbertson,* adopted the test used in *Riley. Id.* Accordingly, the Third Circuit has held that the privilege is qualified, regardless of whether it is criminal or civil. *See Cuthbertson,* 630 F.2d at 146.

■■■ The AP argues that their work enjoys absolute privilege. (AP's Br. at II). The privilege formerly was considered "absolute" when no countervailing constitutional issues were at risk. However, because every case has some constitutional element, such as a litigant's rights to a fair and open trial, an absolute privilege is no longer recognized. *Riley,* 612 F.2d at 715. Moreover, in light of the balancing test employed when considering application of the reporter's privilege, reference to an "absolute" privilege is an academic distinction. The Third Circuit has declared that it is no longer open to question whether there are any "counter-

vailing interests which will suffice to transcend the journalist's privilege....." *Id.* The specific circumstances related to overriding the journalist's privilege will be heard on a case-by-case basis. *Id.*

In the instant case, the AP asserts that the reporter's privilege protects the tape recorded statements made while conducting interviews. (AP's Br. p. 12). For many reporters, tape recording an interview serves as a substitute for note taking. (Affidavit of Kathryn Baker ¶ 3) (hereinafter "Baker Affid."). Kathryn Baker contends that tape recording is more effective because it allows her to be more accurate and complete in her article. (*Id.*) With Bob Dylan, Ms. Baker asserts that she conducted a very informal interview that contained a great deal of "off the record" conversation. (*Id.* ¶ 4). Ms. Baker objects to disclosing her tape recorded interview with Bob Dylan because it would breach her trust and reveal her personal interviewing techniques and methods. (*Id.* ¶ 9–10). The AP posits that compelling disclosure of the information gathered by their journalists may jeopardize possible future interviews to be tape recorded. (Darrell Christian's Affidavit ¶ 11).

The court recognizes that a certain trust exists between interviewer and interviewee. *Riley,* 612 F.2d at 714. This trust extends to all future interviews and is linked with the reputation of not only the reporter but also the Associated Press. *Id.* Any infringement upon this bond, has the potential to offset the vitality of the free exchange of information between journalist and interviewee which form the basis of the reporter's privilege. *Id.*

In opposition to application of the reporter's privilege, the plaintiff contends that the jury should be able to hear Bob Dylan's own voice and not the testimonies of Bob Dylan and Kathryn Baker. (P's Br. II ¶ 8). The plaintiff intends to use the tapes to impeach Mr. Dylan with his own words. *Id.* Alternatively, the plaintiff argues that the Associated Press has waived its right to assert the privilege by permitting Mr. Dylan's publicist to attend the interview.

▮ To overcome the reporter's privilege, the plaintiff must show a "demonstrated, specific need for evidence[.]" *Riley,* 612 F.2d at 716 (quoting *U.S. v. Nixon,* 418 U.S. 683, 713, 94 S.Ct. 3090, 3110, 41 L.Ed.2d 1039 (1974)). This court must examine a balancing test that requires demonstration of "the materiality, relevance and necessity of the information sought ... and a strong showing ... that there is no other source for the information requested." *Riley,* 612 F.2d at 716 (citations omitted).

**C. The Plaintiff has Failed to Demonstrate Sufficient Need to Override the AP's Qualified Privilege not to Disclose the Tape Recorded Interview of Bob Dylan.**

▮ In the instant matter, this court is presiding over a civil action in which a reporter is being called as a witness in a case to which neither she nor her employer is a party. To compel disclosure, the plaintiff must demonstrate:

(i) "that his only practical access to crucial information necessary for the development of the case is through the newsman's sources" (*Riley,* 612 F.2d at 717 (quoting *Gilbert v. Allied Chemical Corp.,* 411 F.Supp. 505, 510 (E.D.Va.1976)));

(ii) that "[t]he material sought must provide a source of crucial information going to the heart of the claim" (*Riley,* 612 F.2d at 717 (quoting *Zerilli v. Bell,* 458 F.Supp. 26, 29 (D.D.C.1978))); and

(iii) that "they exhausted other means of obtaining the information." (*Riley,* 612 F.2d at 717 (quoting *Gulliver's Periodicals, Ltd. v. Charles Levy Circulating Co.* 455 F.Supp. 1197, 1204 (N.D.Ill.1978))).

First, the plaintiff must show the materiality and relevance of the information sought. *Riley,* 612 F.2d at 716. The plaintiff contends that the tape is important for the purposes of revealing Bob Dylan's motive for stealing Mr. Damiano's songs. (P's Br. II ¶ 8). The AP concedes that motive is an element of intent. (*See* AP's Br. at 15). Thus, the tape is relevant.

▮ However, relevance is not the only consideration in cases involving the reporter's privilege. The plaintiff must also estab-

lish necessity. To establish necessity for the tape, the plaintiff must specifically prove that "the material sought ... provides a source of crucial information going to the heart of the claim." *Riley*, 612 F.2d at 717 (quoting *Gulliver's Periodicals, Ltd. v. Charles Levy Circulating Co.*, 455 F.Supp. at 1204). Although motive may be relevant to the plaintiff's case as an aspect of intent, the AP asserts and this court agrees, it is not a central element of a claim for copyright infringement. (AP's Br. at 15–16) (citing *Columbia Broadcasting System, Inc. v. Scorpio Music Distributors, Inc.*, 569 F.Supp. 47, 48 (E.D.Pa.1983), *aff'd on other grounds*, 738 F.2d 421 and 738 F.2d 424 (3rd Cir.1984); *Major League Baseball Promotion Corp. v. Colour–Tex. Inc.*, 729 F.Supp. 1035, 1039 (D.N.J.1990); and 1 William F. Patry, *Copyright Law and Practice* 688–89 (1994)). The court in *Costello Publishing Co. v. Rotelle*, 670 F.2d 1035 (D.C.Cir. 1981), found that "[i]ntent is not a necessary element of infringement." *Id.* at 1044; *see also, Gilbert v. Allied Chemical Corp.*, 411 F.Supp. at 510. Additionally, the Second Circuit has held that the possibility of impeachment is generally not considered crucial to preserving a claim. *Krase v. Graco Children Prods., Inc.*, 79 F.3d 346, 352 (2d Cir. 1996).

In his reply memorandum, the plaintiff asserts that the tape is highly relevant to the claim. (Plaintiff's Reply Brief in support of Motion to Compel the AP p. 3) (hereinafter "P's Reply Br."). The plaintiff relies on *PPM America, Inc. v. Marriott Corp.*, 152 F.R.D. 32 (S.D.N.Y.1993), a case which contained an audiotape of a conference call that was ruled to be materially relevant to Marriott's claim and waived the newsman's privilege. (P's Reply Br. p. 3). The following is a quote from the case contained in the plaintiff's reply brief:

> The facts relating to the Conference Call are both relevant and critical to the maintenance of Marriott's counterclaim for tortious interference with contract. Only a partial transcript of this conference call is presently available to Marriott, and obtaining further information regarding the call may be the only way that Marriott could maintain his claim.

(P's Reply Br. p. 3) (quoting *PPM America*, 152 F.R.D. at 35). However, the plaintiff fails to state that the court in *PPM America*, after administering the balancing test discussed above, found that the information was "both relevant and crucial to the maintenance of Marriott's counterclaim[.]" 152 F.R.D. at 34–35. Additionally, the *PPM America* court noted that Marriott provided proof that the evidence was not obtainable from other available sources. *Id.* at 35. Therefore, the court concluded that the tape was both relevant and critical to Marriott's counterclaim. *Id.* In our case, the plaintiff fails to address the balancing test in general, and specifically fails to address the presence of alternative sources. Further, the material in question is being sought to impeach the defendant with his own words, and impeachment will not suffice as it does not "go[ ] to the heart of the [plaintiff's] claim." *Riley*, 612 F.2d at 717. (P's Br. ¶ 8). Consequently, Mr. Damiano has not shown that his desire for the tape overrides the newsman's privilege.

During oral argument, the plaintiff raised an additional grounds for necessity to compel disclosure: that during Ms. Baker's deposition, Ms. Baker admitted that her "article may not be accurate on an issue important to this litigation." (Plaintiff's Supplemental Letter Memorandum In Support Of Motion To Compel Compliance With Subpoena Served Upon Associated Press, July 29, 1996 at P. 2) (hereinafter "P's Lett.Memo"). In addition, the plaintiff avers that he is only interested in the part of the tape that refers to "writer's block". (*Id.*).

The plaintiff relies on *The Application of Michael Waldholz*, 1996 WL 389261, 1996 U.S. Dist. LEXIS 9648, a case in which the court upheld a subpoena to compel Waldholz, a non-party reporter, to testify. In this case, the defendant Smith asserted that the reporter misquoted him in his article. *Id.* Because the quote was crucial to the pending allegations, the court held that the reporter's testimony was "highly material and directly relevant to the Class' claims because ... the Class predicates defendants' liability in part directly on the statement by Smith reported in Waldholz's Article." *Id.* at * 3.

This case bears no relevance to ours for two reasons. First, Ms. Baker has already testified. Here, the plaintiff is asking for the underlying interview tapes and not a subpoena to compel testimony.

Second, in *Waldholz*, the key issue was the possibility of a misquote which greatly affected the outcome of the case. In our case, there is no accusation of any misquote. The plaintiff is only disputing Ms. Baker's impression of Bob Dylan. In fact, Ms. Baker testified that all of her quotes were accurate and that all of the pertinent information contained on the tapes was contained in her article. (Deposition Transcript of Kathryn Baker p. 32–33 lines 18–25; 1–5) (hereinafter "Baker Dep."). Therefore, the tapes will not give us any better insight than that which Ms. Baker's testimony has already provided.

The plaintiff alleges that the tapes contain information pertaining to Bob Dylan's writer's block. He claims that because he can't hear the tapes, he "is being shut out of all avenues to prove motive." (P's Lett.Memo. p. 3). However, in Ms. Baker's testimony, she specifically answered affirmatively that the tapes contained no such words:

> Mr. Hayes: And would it be fair to say that there is nothing in the transcript that says in words or substance that Mr. Dylan was suffering from writer's block; is that correct?
>
> Ms. Baker: No.
>
> Mr. Hayes: That is correct?
>
> Ms. Baker: That's correct.

(Baker Dep. p. 33 lines 6–12). Unless the plaintiff produces evidence that clearly indicates that information on Mr. Dylan's writer's block exists on the tapes, this court finds no lawful reason to compel production of the tapes. The plaintiff makes allegations about Ms. Baker's testimony, but fails to cite any pertinent excerpt from the deposition transcripts.

Finally, the plaintiff must prove that he exhausted all alternative sources. The Third Circuit has developed a balancing test for determining whether or not all alternative sources have been explored. In *Riley*, the court required proof that:

(i) all alternative sources have been explored;

(ii) a demonstration that no other source exists to get the information requested; and

(iii) the "only practical access to crucial information necessary for development of the case is through the newsman's sources."

612 F.2d at 716–17 (citations omitted).

The Associated Press supplies the court with many examples of unemployed alternative sources available to the plaintiff. In addition to the deposition testimonies of Bob Dylan and Ms. Baker, as well as the published article resulting from the tapes, the AP notes that a "Dylan P.R. person" was also present at the interview. (AP's Br. p. 18). These are all possible independent sources available for the plaintiff to interview. Conversely, the plaintiff does not address the balancing test or supply the court with proof that he in fact did explore all alternative sources.

**D. Plaintiff Asserts that Mr. Dylan's Publicist is a Third Party Whose Presence Constitutes Waiver of Privilege by the AP.**

During oral argument, the plaintiff asserted that the AP waived its privilege because the interview was conducted in the presence of a third party. This court permitted further briefing on this issue. The plaintiff asserts that Elliot Mintz, Mr. Dylan's publicist, was present at the interview and submitted the tapes (with Ms. Baker's permission) to an outside typing service to transcribe the tapes. (P's Reply Br. p. 1). These actions, the plaintiff contends, operate as a waiver of the reporter's privilege.

In support of his argument, Mr. Damiano cites various cases concerning third party disclosure. (P's Reply Br. at 2). In *Stratagem Development Corp. v. Heron International*, 153 F.R.D. 535, 543 (S.D.N.Y.1994), the court stated "voluntary production of a privileged document to a third party 'removes all confidentiality from the document and clearly effects a waiver of any privilege otherwise applicable.'" *Id.* (quoting *Eigenheim Bank v. Halpern*, 598 F.Supp. 988, 991

(S.D.N.Y.1984)). These two cases bare no substantive relevance to our case for two reasons.

 First, in both *Stratagem* and *Eigenheim*, the privilege in question before that court was not the reporter's privilege but the doctrine of attorney work product protection. *See Stratagem*, 153 F.R.D. 535 (S.D.N.Y.1994); and *Eigenheim*, 598 F.Supp. 988 (S.D.N.Y.1984). The reporter's privilege and the attorney work product doctrine serve different functions, and have different rationals for protection from disclosure. While the fundamental purpose of attorney work product is maintenance of confidentiality to protect to adversarial process, the issue of confidentiality is not the exclusive rationale behind the reporter's privilege. The basic rationale accented in *Cuthbertson*, 630 F.2d at 147, is to protect and foster the "free flow of information." The court in *Cuthbertson*, noted that subpoenas of journalists tapes and notes can be "a significant intrusion into the News Gathering and editorial processes," and "may substantially undercut the public policy favoring the free flow of information." *Id.* Therefore, the qualified privilege is designed to protect the overarching public policy of *access* to information, and not confidentiality for a particular party. *Palandjian v. Pahlavi*, 103 F.R.D. 410, 412 (D.D.C.1984).[6] Thus, the assertion that Mr. Mintz is a third party does not vitiate the privilege. Mr. Mintz is employed by Bob Dylan, and had his full confidence. Consequently, dissemination of the news was not hindered by the presence of Mr. Mintz, nor was the cloak of confidentiality lifted.

 As concerns the transcribing of the tapes by an outside typing service, that act is analogous to a court reporter transcribing court records. A court reporter is an outside source and not an officer of the court. However, in terms of confidentiality, a court reporter is bound by the confidentiality of the information and is not an independent third party. Counsel for the plaintiff cannot seriously maintain that simply because a court reporter is involved, the proceedings before him or her are rendered public. Both Mr. Mintz and the typing service were in the employment of the defendant and disclosure to them does not waive the newsman's privilege. Ms. Baker gave her permission for the tape to be transcribed through Mr. Mintz and further asserted that if she would have done it on her own, it would have jeopardized her deadline to print the story because the task would have been too time consuming. (Baker Affid. 12:10–16).

 Finally, the plaintiff argues that because Ms. Baker voluntarily appeared at the deposition, she waived the privilege protecting her material. (Oral Argument of Stephen Kramer, Esquire, Counsel for Plaintiff at pre-trial conference on July 16, 1996) (hereinafter "Pl. Oral Arg."). The AP submits that voluntary appearance at a deposition did not operate as a waiver of either Ms. Baker's privilege or the AP's. (Associated Press Letter Brief in Opposition to Motion to Compel Disclosure of Tapes p. 3) (hereinafter "AP's Lett.Br.").

In *Palandjian v. Pahlavi*, the D.C. District Court found that a non-party reporter who voluntarily appeared in good faith and without counsel to testify did not waive his privilege. 103 F.R.D. at 413. In that case, during the deposition, the reporter was asked if he would produce "notes and tapes from which the article was directly written." *Id.* at 411. Because the reporter answered no, the court held that as a layman he did enough to assert his rights not to disclose his resource materials. *Id.* at 413. In the instant case, Mr. Kramer, asked Ms. Baker if she would produce the tapes prior to the deposition. Ms. Baker declined. This colloquy was memorialized in the deposition:

---

**6.** The rationale for the reporter's privilege is further underscored by the Third Circuit's rejection of Judge Rambo's interpretation of the privilege. In a concurring opinion in *Criden*, 633 F.2d 346 (3d Cir.1981), Judge Rambo criticized the previous opinion in *Cuthbertson*, which focused on the importance of access to information and freedom of the press. Judge Rambo advocated for a privilege which would consider confidentiality the central element of the privilege. *Id.* at 360–61. The court rejected that interpretation, and relied upon the abstract concerns of the First Amendment and the pragmatic concerns of the candid reporting of newsworthy events. *Id.* at 355–56.

Mr. Kramer: And when I interviewed you a few days ago, did I ask you if you would produce the tapes?

Ms. Baker: Yes.

Mr. Kramer: And did you essentially state that you felt that you were not at liberty to do so because it was the property of the Associated Press?

Ms. Baker: Right.

Mr. Kramer: And if I wanted it, I needed to go that route?

Ms. Baker: Right.

Mr. Kramer: But I did ask you to produce it?

Ms. Baker: Yes.

(Baker Dep. p. 45–46 Lines 17–25, 1–3).[7] Ms. Baker's response to these questions is a clear assertion of her rights. This court cannot expect a layperson who has on good faith and without counsel appeared for testimony to know the law beyond his or her scope of duty. Ms. Baker said she would not produce the requested materials and this court holds that she in fact did not waive her privilege despite the plaintiff's argument that voluntary appearance denotes waiver. Furthermore, the plaintiff fails to cite any part of the deposition testimony of Ms. Baker or any law which supports his argument.

Because the plaintiff does not present—nor does the court perceive—a compelling argument in support of production, the court will not compel the AP to disclose the tape recordings of Bob Dylan. The claim set forth by the plaintiff falls far short of the type of specific findings of necessity which may overcome the reporter's privilege. The plaintiff's motion to compel the interview tape from the Associated Press is hereby *denied.*

### E. *Plaintiff's Motion to Compel Bob Dylan to Consent to the Production of the AP's Tapes*

As discussed above, the plaintiff has failed to provide sufficient need to transcend the reporter's privilege. In this motion, however, the plaintiff is seeking to compel Bob Dylan to consent to the production of the AP's interview tapes. (Plaintiff's Brief in Support of Motion to compel Bob Dylan to Consent at 3).

This motion presents two issues to the court: (i) whether the holder of the reporter's privilege is the AP or Bob Dylan. If the AP retains the privilege, then Mr. Dylan can not disclose the tapes even if he consents; and (ii) if Mr. Dylan holds the privilege along with the AP, should the court compel consent.

In *Cuthbertson,* the Third Circuit recognized in a criminal case that the Columbia Broadcasting System (hereinafter "CBS") was the holder of the reporter's privilege where one of its programs, "60 Minutes", conducted interviews that were relevant to the case. 630 F.2d 139. Like the case before this court, CBS was subpoenaed to disclose the tapes because they were said to have impeachment value at trial. *Id.* However, the court held that the privilege belonged to CBS and not the witnesses. *Id.* at 146. The court further held that the privilege extends to the unpublished materials in the possession of CBS, and can be waived only by CBS. *Id.* Although in a concurring opinion in *Criden,* 633 F.2d 346 (3d Cir.1981), Judge Rambo criticized the previous opinion in *Cuthbertson,* the case was not overruled and the majority upheld the reasoning in *Cuthbertson. Id.* at 359. District Judge Rambo, in her concurrence, stated that the reporter's privilege disappears "once the source willingly identifies himself and consents to disclosure of his communication."

---

7. New Jersey Law protects all information that was not produced by a reporter. *Maressa v. New Jersey Monthly, et al.,* 89 N.J. 176, 183–196, 445 A.2d 376 (1982). In *Resorts International, Inc. v. NJM Associates,* 89 N.J. 212, 445 A.2d 395 *cert. denied,* 459 U.S. 907, 103 S.Ct. 212, 74 L.Ed.2d 169 (1982), the New Jersey Supreme Court held that a reporter did not waive his privilege despite answering some interrogatories and producing some of the requested documents and sources.

The court ruled that "publication constitutes a waiver only as to those specific materials published." *Id.* (citing *Maressa,* 89 N.J. at 183–196, 445 A.2d 376). "The fact that defendants in this case responded to the trial court orders by providing additional information, including the names of about 20 sources who had not requested confidentiality, does not waive the privilege as to any other information." *Resorts,* 89 N.J. at 215–16, 445 A.2d 395.

*Id.* at 360. However, the majority held that "the privilege belongs to the [news agency], not the potential witness, and it may be waived only by its holder." *Id.* at 359–60 (quoting *Cuthbertson,* 630 F.2d at 147). Thus, the privilege belongs to the AP, and Ms. Baker's attendance at deposition did not constitute a waiver of that privilege. *See Criden,* 633 F.2d at 359–60.

Thus, Mr. Damiano's attempt to access the information covered by the reporter's privilege through Bob Dylan is unavailing. However, even if Mr. Dylan had been a holder of the privilege as discussed with reference to the AP motion, the plaintiff has shown no basis to compel the information. Consequently, the motion shall be *denied.*

## IV. *Plaintiff's Motion to Compel Production of Press Clipping Binders*

The parties have informed the court that the motion to compel production of press clipping binders has been resolved by the parties. Thus, the court hereby dismisses this motion as moot.

### CONCLUSION

Based upon the record before me, the defense has shown "good cause" for designating all discovery materials including deposition transcripts as "confidential information". The balancing factors in *Pansy* have been met by the defendants. Through specific examples, the defense illustrated a substantive need to order all discovery materials, including deposition transcripts, as confidential information. The motion is hereby *granted.*

The plaintiff has failed to show any need to compel production of certain documents from the defendants, therefore the motion is hereby *denied.* Similarly, the plaintiff's motion to compel the Associated Press to disclose its tape recorded interview of Bob Dylan is hereby *denied.* In a parallel motion, the plaintiff's motion to compel Bob Dylan to disclose the AP tape recorded interview shall be *denied.* Mr. Dylan does not hold the privilege, and, even if he did, the plaintiff has shown no compelling need to disclose the material.

Finally, the plaintiff's motion to compel production of the press clipping binders is hereby *granted.* The motion is justifiable but costly, therefore, the press clipping binders shall be disclosed at the expense of the plaintiff.

### ORDER

This matter having been brought before this court upon the motion of Steven D. Johnson, Esquire, counsel for the defendants, Sony Music Entertainment Inc. and Bob Dylan, for a protective order to designate all discovery material as confidential information pursuant to Rule 26(c), Fed.R.Civ.P., and Rule 15(F), General Rules for the District of New Jersey; and upon the motions of Steven M. Kramer, Esquire, counsel for the plaintiff, James Damiano: (i) for an order compelling production of documents from defendants Sony Music Entertainment and Bob Dylan; (ii) for an order enforcing a subpoena served upon the Associated Press compelling an interview tape of defendant; (iii) for an order compelling Bob Dylan to consent to production of the Associated Press; and (iv) for an order compelling production of press clipping binders from the defendants; and the court having considered the submissions of the parties; and the court having further considered the oral argument conducted on the record on July 17, 1996; and for the reasons noted during oral argument and in the letter opinion entered this date;

IT IS this 6th day of August, 1996 hereby

*ORDERED* that the defendants' motion to designate all discovery materials as confidential pursuant to Fed.R.Civ.P. 26(c) shall be *GRANTED;* and

IT IS FURTHER *ORDERED* that the plaintiff's motions to compel documents from the defendants is *DISMISSED IN PART AS MOOT* and *DENIED IN PART:* (i) concerning the Unit Sales Information, the motion is *DENIED;* (ii) concerning the (a) motion to compel disclosure of documents revealing the reasons for the decision to release Bob Dylan's "Greatest Hits" albums, and (b) to compel disclosure of documents discussing the status of Bob Dylan's career and attempts to jump start it, the motion shall be *DISMISSED AS MOOT;* and

IT IS FURTHER **ORDERED** that the plaintiff's motions to enforce the subpoena served upon the Associated Press and to compel Bob Dylan to consent to production of the Associated Press's taped interview shall be **DENIED;** and

IT IS FURTHER **ORDERED** that the plaintiff's motion to compel production of the Bob Dylan's press clipping binders shall be **DISMISSED AS MOOT** at with the opinion rendered this date.